MAX HOCHSCHILD, LOUIS B. KOHN AND BENNO
KOHN, Co-PARTNERS, TRADING AS HOCHSCHILD,
KOHN & COMPANY,

*vs.*

MARY D. CECIL.

*Negligence : revolving door.    Prayers : validity ; consideration of
prayers.*

A prayer based upon a theory of which there is no evidence
in the case, and which would have been foreign to the issue, is
erroneous.                                                    p. 79

Where the *only question* of negligence in the case and the
*only evidence* adduced was concerning the construction and use
of a revolving door as an entrance to the department store of
the defendant, a prayer, correct in itself, is not rendered vicious
merely because one part of the prayer predicates the liability
of the defendant to depend upon his permitting *anything of a
dangerous character* to exist therein which results in one avail-
ing herself of the invitation, etc., being injured, as it was held
the jury could not have been misled, as there was but one door
complained of, to which their minds were specially directed, and
no other of a dangerous character mentioned or referred to.
                                                             p. 79

In passing upon the validity of a prayer, it must be consid-
ered as a whole, and in connection with other granted prayers.
                                                             p. 78

*Decided June 28th, 1917.*

Appeal from the Superior Court of Baltimore City. (HEUISLER, J.)

The appellee was injured in a revolving door in the department store of the appellants: judgment having been entered up on a verdict for $15,000 in favor of the plaintiff, this appeal was taken.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and CONSTABLE, JJ.

*Wm. L. Marbury* (with *Marbury, Gosnell & Williams* and *Lucius Q. C. Lamar* on the brief), for the appellants.

*L. Wethered Barroll* (with whom were *Hope H. Barroll* and *Robert J. Gill* on the brief), for the appellee.

PATTISON, J., delivered the opinion of the Court.

This is an appeal from a judgment recovered by the appellee against the appellant for injuries sustained by her in entering the storehouse and premises of the defendants through a revolving door.

The action in this case was brought upon a declaration containing two counts. The alleged negligence charged against the defendants in the first count causing the injury complained of, is that, they neglected to discharge and perform the duty of providing for the safety of their customers "by having proper friction strips attached to said door, which strips were not properly attached, but the said strips had been worn, so that the door revolved with a dangerous ease and rapidity, with which it should not have revolved"; and in the second count, they are charged with the failure "to exercise ordinary and reasonable care in the control of the operation and movement of the said door."

The plaintiff, a woman 68 years of age, in stating the circumstances of the accident, which occurred on December 4, 1915, said: "I went to Hochschild's (the defendant) upon the Howard street side, entering the first door; as I went in, the door was apparently moving very slowly, and I went in my usual way, I am always cautious, was always cautious, of those doors, and before I escaped the door there was a sudden blow, someone, or there came a sudden blow that threw me on the floor, struck me on my right arm and side and threw me on my left side on the floor. It came so suddenly that I did not realize for an instant what had happened, and after a moment, of course, they came to me and helped me up." She further testified that it was the door that struck her, that she "felt the blow very decidedly." That partitions in the door were of glass and she saw no one in front of her, at the time, passing through the door. Whatever motion there was came from behind and she failed to see it; that she saw a colored man standing between the doors, that is, between the two revolving doors, one of which she entered. She could not say whether the man touched the door or not, but he did not stop it, or it would not have struck her; that she was a regular customer at the store and was acquainted with the premises and the door through which she passed. She had gone through it many times. As to this particular door she said, "somehow I always felt it was more dangerous, I do not know why, but it always seemed to me to be more dangerous than the others." She said, "I did not stop in the door. I did not go very fast because I never do rush in those doors, but I went my ordinary gait." When asked how she was thrown to the floor she answered, "I was thrown on my left side, it struck me on my right shoulder and side, and my left side and hip sustained the injury, the fractured break."

There were no other witnesses offered by the plaintiff as to the circumstances of the happening of the accident.

Joseph L. Downes, general agent of the Northwestern Life Insurance Company, and brother of the plaintiff testified,

that he examined the door sometime between the 10th and
15th of December, and "found the rubbers on the sides that
held the door in very bad shape" and the door, if you went
through it at any ordinary speed, would go around four or
five times," by giving the door "an ordinary push it would
keep going around unless somebody else went in there or the
man caught it." That the strips were placed on what he
"would call the back of the arms," that they were worn out
and did not have the effect of retarding the speed of the door
in revolving, "they barely touched" the well of the door.
He testified that the door in which the accident occurred
differed from the other door on Howard street in that it had
a solid top; that he did not know whether this caused the door
to go fast or not; that he examined other revolving doors in
other department stores in the neighborhood and also one at
the Calvert Bank. "Those doors did not go anything like
as fast as the door in which the plaintiff was injured, nor
did the other door on Howard street in the same building."

John H. Driver, engaged in the business of supplying
specialties to buildings, testified that he was familiar with
revolving doors, that the door in question "is what is known
as the Van Kannel Door, which is the pioneer revolving
door." He described such door by saying, "if you can imag-
ine a table with one leg and fastened to the leg four flaps or
wings, this table instead of being fastened at the top, and
supported at the top, it runs on an axle at the top, supported
at the bottom, it works more like a top than anything I can
compare it to."

He stated that, "the speed of the door is governed by the
friction of the strips, not weather strips, but side flaps that
project and engage the well or opening which the door is in,
so that the door cannot run away." That there is nothing
about the door to prevent it from running away except the
side flaps that brush the well; that they curve as they go
around, although they are apparently straight; that they act
as a brake; that two of them at all times brush against the

side of the well.   That they are made of hard rubber and "should at least rub from a quarter to a half inch on this surface."

Witness further said that a door used as much as the one in question should be inspected not less than once a week, and the "adjusting of the strips possibly once a month, and new strips not less than once a year, because weather conditions hurt a strip.   In the summer time it dries up."

Witness then told how to adjust or remove the strips, and stated that when properly adjusted "the door will open and possibly one flap will move one-third of the circumference of the door."   When the pressure is removed "the door will come back to a stand-still within about six inches," and where the strips are properly adjusted the door is considered fairly safe.

James B. Scott, Consulting Engineer, when produced by the plaintiff testified that the rubber strip has two or three functions; first of all, it performs the function of a weather strip, and in addition to that it retards the revolution of the door "so the speed will not become excessive without an abnormal amount of power being exerted on the door."   That it also performs the function of a flexible edge so if a person should inadvertently get his fingers caught between the well of one of the strips "they would meet the yielding surface of the rubber instead of being sheared off as they would be if the doors were rigid at the edge."

He further stated, however, if the rubber strip was not used "it would be necessary from a point of safety, to adopt some other device to dampen the revolution of the door," but the use of these strips is "the simplest and most common sense way to accomplish the object"; and that they also accomplish "two or three other objects at the same time."

Witness in speaking of the Van Kannel Door said it is what you might call an obsolete type of door.   "You might say it was one of the original doors, the pioneer door."   That it differs from the modern door in that the latter has "a sta-

tionary ceiling," and a rubber strip at the top and bottom which furnishes additional friction, although the main point, where the friction is applied is at the circumference of the door. The principal advantage, however, in the modern door, over the other, "is that it eliminates this big fly wheel top," which in the former type revolved with the door, and gives to its movement a greater momentum."

There were other witnesses produced by the plaintiff who testified as to the character and extent of the injuries sustained by her, but it is not necessary to state the evidence of these witnesses in deciding the questions of law presented by this appeal.

Walter Sondheim, the general manager of the defendant firm, offered by the defendant, testified that he did not know of any difference between the movement of the old and new type of doors, but was inclined to think that the old type was more difficult to revolve than the new type. It revolved less freely than the new, and required a little more effort to push it around. The strips, as he stated, were put there for two reasons, one to keep out the dust, and draught, and the other to protect the fingers of persons in taking hold of the edge of the door. That the strips were not there for the purpose in any way of affecting the speed in the operation of the door; he did not know how often the rubber strips had been removed and new ones put on. That the doors were actually used eight months in the year, and in his opinion the table at the top of the door tends to retard its motion.

Dent Downing, house-keeper at defendants, who had charge of the doors, when called by the defendant testified, that he makes a general inspection of the store several times a day, sees that the doors are clean, that they revolve properly, and are in proper mechanical condition, that he was familiar with the door where the accident occurred. There is no difference, he states, between the old and new type of doors so far as the speed and operation by the public is concerned. There is upon the doors two brass bars, with sufficient space between

the bars and the glass for a hand hold which is to enable the passenger to go through in safety. He did not know when these strips were replaced, prior to the 4th day of December, 1915, but was sure they had been replaced within two years; that they were not replaced on account of the rubber wearing out, but because of people tearing some parts of them away and making them look ragged and ugly. This was done on an average about once a year. He never removed the rubber strips and replaced them "with reference to their causing more or less friction on the doors." They had extended the rubbers to keep out the air and at the same time it increases the friction, but they were never extended for the primary purpose of increasing the friction. That had never entered his mind.

George W. Morey, chief engineer, at the store of the defendants, when offered as a witness by them stated, "that the door in question moved as hard, if not a little harder, than the other doors, that they considered it in a good condition on December 4th, 1915, the strips touched the walls of the door opening, sufficiently to keep out the air."

Mrs. Louise Robinson, an employee of the firm of Hochschild, Kohn & Company, and who was in the store at the time of the accident, testified for the defendant saying, I saw a frail, elderly lady walking slowly through the door, apparently she hesitated a moment; then a customer came to my counter and I turned to the customer, just as quickly the lady fell, and I excused myself and went to her assistance, that when she hesitated she was just inside the door just as she had passed through it.

The record discloses that there were seven exceptions noted by the defendant to the rulings of the Court on the evidence and one to its rulings on the prayers.

The plaintiff offered four prayers. The first and second were refused, and third and fourth were granted.

The defendant offered five prayers, the 1st and 5th were refused, the 2nd, 3rd and 4th were granted.

The defendant's first prayer is as follows: "No evidence has been introduced in this case legally sufficient to entitle the jury to find that the injuries to the plaintiff complained of in the declaration were caused directly by the violation or neglect on the part of the defendants of any legal duty resting upon them, as alleged in the declaration, and, therefore, the verdict of the jury should be for the defendants, upon the issues joined."

This prayer, as we have said, was refused, and we think, properly refused, as the evidence, in our opinion, is legally sufficient to take the case to the jury.

In *Norton* v. *Chandler Co., Inc.,* 221 Mass. 99, the facts offered to the jury, were very nearly the same as those presented in this case, and in that case the Court held that such facts "warranted the finding of negligence on the part of the defendant, first in not inspecting the friction strips, and second, in allowing the door to fall into a defective condition through failure to adjust the friction strips on their being worn down." And we find no error in the rejection of the defendant's fifth prayer.

The case was submitted to the jury upon the plaintiff's 3rd and 4th and the defendants' 2nd, 3rd and 4th prayers.

The plaintiff's 3rd prayer instructed the jury "that when the proprietor or owner of a store, used for selling merchandise, expressly or by implication, invites others to come upon his premises, either for business or for any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger and to that end he must exercise ordinary care and prudence, to render the premises reasonably safe for the visit. Where the owner or proprietor of a store expressly or by implication invites others to come into the store, if he permits anything of a dangerous character to exist therein which results in injury to one availing herself of the invitation, and who at the same time is exercising ordinary care, such owner or proprietor is answerable for the consequence."

In determining the correctness of this prayer we must not only consider the part to which objection is made, but in connection with it, we must also consider the conceded portion of the prayer as well as the other granted prayers in the case, in respect to the evidence offered.

It might be said of the part of the prayer objected to, if standing alone, that it ignores the necessity of finding negligence on the part of the defendant and permits the plaintiff to recover though such negligence be not shown, but the necessity for such finding we think is sufficiently shown by the prayer as a whole, when the part objected to is considered in connection with the earlier part of the prayer; and we think the necessity for so finding would be so understood by the jury. That such was the meaning of the prayer is further shown by the instruction of the Court contained in the defendant's third prayer, where the jury were instructed that the plaintiff was "not entitled to recover in this case until they are satisfied from the evidence that the defendants, Hochschild, Kohn & Company, failed to exercise due care to provide for the use of their customers, a revolving door in such condition, at the time of the accident, that it could be used with reasonable safety by persons using reasonable care." The prayer states that liability attached to the defendant "if he permits *anything of a dangerous character* to exist therein which results in injury to one availing herself of the invitation," etc., but it is shown by the record that the evidence of negligence is confined solely to the defective door, no other thing of a dangerous character was mentioned or referred to, therefore it was only to the defective door that the minds of the jurors could have been directed.

The plaintiff's 4th prayer was the usual damage prayer in cases of this character and was properly granted.

The Court's ruling upon the first exception to the evidence was correct, as the exception came too late, and we find no error in its ruling on the second exception. The third, fourth, fifth and sixth were to the refusal of the Court to

admit testimony offered by the defendant, that there were no revolving doors in general use, so constructed that a person using it could not be knocked off his feet by another coming behind him and pushing with violence against one of the partitions of the door.

The negligence charged against the defendants was that they negligently failed to maintain the door in a reasonably safe condition for the use of their customers, exercising reasonable care.

There was no evidence whatever that the fall of the plaintiff resulting in the injury complained of was caused by any one passing through the door behind her and pushing one of the partitions of the door, and we fail to see how the fact sought to be proved under these exceptions could in any way properly aid in deciding the issues presented, but such fact we think, would be entirely foreign to the issue, and one that should not have been admitted, consequently the Court was right, in our opinion, in excluding this testimony.

As we find no errors committed by the Court in its rulings, the judgment below will be affirmed.

*Judgment affirmed, with costs to the appellee.*