# THE GOSMAN GINGER ALE COMPANY OF BALTI-MORE CITY, A Corporation, and WILLIAM L. STRAUS

*vs.*

# KEYSTONE BOTTLE MANUFACTURING COMPANY, INC., A Corporation.

*Contracts: construction; "as soon as possible." Prayers: instructions to find for plaintiff on certain issues, together with instructions to find for defendants generally. Exceptions: must not include ruling on motion to strike out evidence with ruling on prayers.*

The phrase, "as soon as possible," in a contract for the sale of goods then to be manufactured should, under certain circumstances, be construed as equivalent to "within a reasonable time."
p. 375

Where one of the plaintiffs' prayers concludes with an instruction to find·for the plaintiffs on certain issues, and the defendant's prayers conclude with an instruction to find generally for the defendant (there being several issues raised by the pleadings), it is no error to grant the plaintiffs' prayer in conjunction with a defendant's prayer.               pp. 377-378

An exception can not properly include a ruling of the trial court on a motion to strike out certain evidence together with a ruling on the prayers, even though the exception and prayers were offered and ruled on at the same time, at the close of the evidence.                          p. 378

*Decided April 10th, 1919.*

Appeal from the Superior Court of Baltimore City. (DAWKINS, J.)

The cause was argued before Boyd, C. J., Briscoe, Burke, Thomas, Pattison, Urner and Constable, JJ.

*Eli Frank* and *John C. Beeuwkes,* for the appellant.

*R. Contee Rose* and *S. S. Field,* for the appellee.

The following are the prayers directed by the Court in its opinion to be set out in the report of the case:

*Plaintiff's 1st Prayer.*—If the jury find that the written contract dated February 5th, 1917, offered in evidence, was executed by the parties thereto and delivered to the plaintiff, and that the sale evidenced by said contract was made by the plaintiff on the joint credit of the defendants, and that said contract was subsequently modified by the parties thereto in the particulars set forth in the letter to the plaintiff of March 29, 1917, offered in evidence; and shall further find that within a reasonable time thereafter under the circumstances, the plaintiff delivered to the defendants a carload of bottles in conformity with the said modified contract, and the defendants accepted and paid for the same; and shall further find that the plaintiff was ready, able and willing to deliver the remainder of the bottles according to said contract; and that the defendants refused to accept any more bottles under said contract; then the jury are instructed that their verdict should be for the plaintiff against both defendants, on the issues joined on the first and second pleas of the defendants. (*Granted in connection with defendants' first, second and fourth prayers.*)

*Plaintiff's 7th Prayer.*—If the jury find the execution and delivery of the letters of February 5th and March 29th, 1917, offered in evidence, and that the plaintiff shipped the first carload of bottles within a reasonable time after receipt of the letter of March 29th, 1917, under the circumstances then existing as shown by the evidence, then the jury are instructed that such shipment was a performance on the part of the

plaintiff of the requirement of the contract as to the time of shipment of the first car.  (*Granted.*)

*Defendant's 1st Prayer.*—The jury is instructed that if they shall find that plaintiff delivered to defendant, the Gosman Ginger Ale Company, one carload of bottles and that said defendant accepted and paid for the same, and that plaintiff and said defendant mutually agreed that the contract between them should be cancelled as to the remaining bottles provided for therein, then the verdict of the jury must be for both of the defendants.  (*Granted in connection with plaintiff's first prayer.*)

*Defendant's 2nd Prayer.*—The jury is instructed that if they shall find that Smart, president and general manager of plaintiff, and Straus, president of defendant—the Gosman Ginger Ale Company, agreed that the defendant, the Gosman Ginger Ale Company, accept and pay for one carload of bottles and that the contract sued on in this case should be cancelled as to the remaining bottles provided for therein, and if the jury shall further find that said defendant did accept and pay for one carload of bottles, then the verdict of the jury must be for both defendants herein.  (*Granted in connection with plaintiff's first prayer.*)

*Defendant's 4th Prayer.*—The jury is instructed that if they shall find that plaintiff delivered to defendant, the Gosman Ginger Ale Company, one carload of bottles and that said defendant accepted and paid for the same, and that plaintiff abandoned the performance of the contract as to the remaining bottles thereby provided for and that defendants assented to such abandonment, then the verdict of the jury must be for both the defendants.  (*Granted in connection with plaintiff's first prayer.*)

Thomas, J , delivered the opinion of the Court.

On the 5th of February, 1917, the appellants, the Gosman Ginger Ale Company, a Maryland corporation, and William L. Straus, and the appellee, the Keystone Bottle Manufacturing Company, a corporation of Uniontown, Pennsylvania,

entered into the contract shown by the following order and acceptance:

"February 5, 1917.

"Keystone Bottle Mfg. Co., Inc.,

"Uniontown, Pa.

"Gentlemen:

"Enter our order for 1,500 gross flint, plain crown Sodas, machine made, average 16 ounce weight, and 15½ ounce capacity to filling point. Price in bulk one thousand (1000) gross at $4.75 per gross, five hundred (500) gross at $5.00 per gross, f. o. b. factory, Uniontown, Pa., with the carload freight rate that is in force January 25th, 1917, allowed to Baltimore, Md. Terms, 30 days, or 1% cash in 10 days, and these terms are applicable from date of invoice. Shipment via Baltimore and Ohio R. R. Company, in approximately 250 gross cars, first car as soon as possible, second car 30 days thereafter, third car 30 days after second shipment, fourth car 30 days after third shipment, fifth car 30 days after fourth shipment, sixth car 30 days after fifth shipment. We understand, of course, that date of shipments are approximate.

"Payment of this account is guaranteed by Mr. W. L. Straus, of the Monumental Brewing Co., of Baltimore, Md., and for further reference, refer to the National Marine Bank, National Exchange Bank, Cahn-Coblens & Co., Monumental Brewing Co., Joel Gutman Co., all of the above are of Baltimore, Md.

"Shipments to be made to the Gosman Ginger Ale Co., Baltimore, Md.

"Yours very truly,

"(Signed)   Gosman Ginger Ale Co.,

"W. L. Straus, Prest.

"Accepted:

"Keystone Bottle Mfg. Co., Inc.,

"W. H. Smart, Prest.

"I personally guarantee payment of above account in accordance with the terms set forth herein above.

"Wm. L. Straus."

The sale of bottles referred to in said contract was negotiated by Mr. Oscar Hamburger, the agent of the appellee in Baltimore City, and shortly after the date thereof he submitted to the appellants samples of the bottles to be furnished, which had been sent to him by the appellee. These samples were not satisfactory to Mr. Straus, the president of the Ginger Ale Company, because all of them did not weigh sixteen ounces. Mr. Hamburger contended that the terms of the contract which required the bottles to be of "average 16 ounce weight" meant, according to "a general custom of the trade," bottles weighing between fifteen and sixteen ounces; and that the samples complied with the contract; that if the appellants insisted upon bottles weighing not less than sixteen ounces, the contract should specify an average weight of seventeen ounces, which would cost more than the "average 16 ounce weight" bottles. The appellee also wrote the appellants as follows:

"Mar. 20, '17.

"Mr. W. L. Straus, Pres.,

"Gosman Ginger Ale Co.,

"Baltimore, Md.

"Dear Sir—Mr. Oscar Hamburger, who has had charge of the order of bottles that we have for you, has written us under recent rate, 'in your approving of the sample lot of the one-half (½) gross you stipulate that the bottles must be 16 oz. down weight, and if such, all would be satisfactory, etc.'

"We have written him in the meantime, 'that in order to make all bottles 16 oz. down weight we would necessarily have to have a base weight of 17 ounces, and that the additional ounce required would be at an extra cost of twenty-five (25) cents per gross,' etc. But at the same time the sample bottle sent you, while there may have been a slight variation in weight, are the regulation 16 oz. weight bottle. He, Mr. Hamburger, in turn writes us under date of the 19th, that since receipt of our communication he had been trying to get in communication with you in order to impart the

circumstances, but had failed to do so, and he was incidentally called out of the city and would be absent for the week and suggest that we communicate with you direct in order to get a prompt decision in the matter, as this is most important, both the promptness and decision referred to. We do not have any too much time to complete your order and under these treacherous conditions Re—Supplies, etc., it is most imperative that we have your approval by return mail if at all possible. The question is, if bottles are required to be 16 oz. down weight we must have a 17 ounce base weight from which to work, and this incurs an additional cost of twenty-five (25) cents per gross. Of course, we understand perfectly, that the bottles must hold average 16 oz. brimful or 15½ oz. to filling point.

"We again wish to impress you that delays are most dangerous and we would kindly ask you to give us an immediate response. If regulation 16 oz. bottle will meet with your approval, we can proceed promptly with the order and soon have a car ready for shipment, but again reiterate that if you exact 16 oz. down weight we must have the 17 ounce base.

"Respectfully yours,
"Keystone Bottle Mfg. Co."

Mr. Straus insisted, however, that nothing less than a sixteen ounce bottle would be satisfactory, and also refused to pay more than the price agreed upon. Accordingly other samples of bottles were sent to and approved by the appellants, and the matter was finally adjusted in accordance with Mr. Straus' demands by the appellee agreeing, through Mr. Hamburger, to furnish under the contract bottles of "17 ounce average" weight. As evidence of the adjustment, and of the necessary modification of the original contract, the appellants sent Mr. Hamburger the following letters:

"Baltimore, Md., March 29th, 1917.
"Oscar Hamburger,
   "302 Home Bank Bldg.,
      "City.

"Dear Sir—We enclose letter to your principals, the Keystone Bottle Mfg. Co., Inc., of Uniontown. Will you kindly note same and forward to them?

"Yours very truly,
         "The Gosman Ginger Ale Co."

"Baltimore, Md., March 29, 1917.
"Keystone Bottle Mfg. Co., Inc.,
   "Uniontown, Pa.

"Gentlemen—As per interview of the 27th with Mr. Hamburger, we beg to advise that you can make shipments applying to our contract order.

"We understand that the bottles are to be same shape as samples submitted, 16 oz. average capacity when brimful, and we can then adjust our filling point.

"Weight of bottle is to be 17 oz. average, and we understand that this means about 16½ to 17 ozs., and on this basis all of your shipments will be accepted.

"Yours very truly,
         "The Gosman Ginger Ale Co.,
                  "H. P. Coffin."

The letter to the appellee was forwarded to it by Mr. Hamburger, who states that about a week after the date of the letter Mr. Straus asked him over the phone if the appellee was going to fill the order, and that he replied "assuredly," and that the appellee had "made the modifications, and were going along with the order." Mr. Straus' version of that conversation is that he told Mr. Hamburger that he would like to have a prompt shipment of the bottles, and Mr. Hamburger said to him "it shall be done, I will see to it."

On the 7th of June, 1917, the appellee made the first shipment of bottles under the contract to the Gosman Ginger Ale Co., and wrote that company on the 9th as follows:

"Uniontown, Pa., June 9, 1917.
"Gosman Ginger Ale Co.,
    "Baltimore, Md.
"Gentlemen:        Attention of 'Mr. W. L. Straus.'.

"We have shipped you a car of Ginger Ale Bottles applying to your contract and trust that same will arrive promptly.

"We will apreciate your kindness if you will discount our invoice less 1% ten days from date of shipment, as we are required to pay spot cash for all raw materials, etc., entered into the manufacture of Bottles and even under these strenuous circumstances we are most fortunate to procure material and likewise labor.

"On account of changing molds to conform with ideas mutually agreed upon and of which you are familiar, we were not in position to forward the first car at an earlier date, and it is not necessary to apprise you in detail of the causes and circumstances of the delay because you are familiar with the conditions existing in all lines.

"Your contract calls for one car per month, and this would mean that you would receive another car in July.

"We close in August; therefore, shipments could not be resumed until some time in September. However, we want to take care of your requirements to the best of our ability, and we ask, if it is agreeable, to ship additional cars, two or three, more or less, before August 1st, 1917.

"An immediate reply is necessary, because any delay will change our plans, so will expect your response by return mail, for which we thank you in advance.
                    "Yours very truly,
                        "Keystone Bottle Mfg. Co."

As soon as the Gosman Ginger Ale Company received the invoice and bill of lading for the car Mr. Coffin, the bookkeeper of the company, telegrapghed Mr. Straus, who was in Cleveland, Ohio, and upon receiving a telegram from him to

reject the bottles, he wrote Mr. Hamburger on the 9th of June as follows:

"June 9th, 1917.

"Mr. Oscar Hamburger,

"Baltimore, Md.

"Dear Sir:

"We enclose invoice and bill of lading for a carload of bottles from the Keystone Bottle Mfg. Company, Uniontown, Pa., which we can not accept.

"The writer has been trying to reach you by phone regarding this, but failed to do so, and we are sending you the papers so that you may make whatever disposition of the car you desire.

"Yours truly,

"The Gosman Ginger Ale Co."

Mr. Coffin testified that Mr. Hamburger, after receiving the above letter, called him up and asked why the invoice and bill of lading were returned, and that he told Mr. Hamburger "that he had been instructed by Mr. Straus to tell him that owing to the fact that so long a time had gone by and nothing had been heard from him or the factory the Gosman Ginger Ale Company considered the contract cancelled and, for that reason, had met its requirements elsewhere." He further testified that in accordance with instructions from Mr. Straus he wrote the appellee, in reply to its letter of the 9th of June, the following letter, which Mr. Straus says he dictated to Mr. Coffin over the phone from Cleveland:

"June 11th, 1917.

"Keystone Bottle Co.,

"Uniontown, Pa.

"Gentlemen:

"In reply to yours of June 9th, we would say that upon receipt of your invoice and bill of lading for carload of bottles, after endeavoring in vain to reach your representative, Mr. Oscar Hamburger, by phone, we returned the papers to him, advising him that we could not receive the shipment. Since the latter part of March, we have heard absolutely nothing from you

regarding the bottles, and as it is necessary for us to have bottles we were obliged to purchase in the open market. Had you advised us before shipment of your intention to ship, we could have taken the matter up with you at that time, so under the circumstances we turned the papers over to your representative as promptly as possible, so that you could make disposition of the car which was shipped without even asking for billing instructions. We feel that it was not our fault that the bottles first submitted to us did not fulfill the contract. We have advised Mr. Hamburger, as your representative, that we had considered the contract cancelled.

> "Yours very truly,
> "The Gosman Ginger Ale Co."

William H. Smart, the president of the appellee, testified that the appellee's factory is in Uniontown, Pennsylvania, and that upon receipt of the Gosman Ginger Ale Company's letter of March 29th, containing the change made in the original contract, the appellee immediately expressed the molds to the mold maker, Charles Theopholus & Company, in Philadelphia, which is unusual owing to the weight of the molds, which are cast-iron molds, to be remodeled and enlarged in order to make up the differnce in "the average ounce weight" of the bottles, and requested that company to expedite the changes and to hurry the shipment back "with all possible haste"; that there was some little delay in getting them back, and as soon as the appellee got the molds back it made the first shipment of bottles "just as promptly as possible." He further testified that the first intimation he had of an attempt to cancel the contract was on June 9th or 11th, when he happened to be in Baltimore on his way home and stopped at Mr. Hamburger's office, and was told of the return of the invoice and bill of lading; that he then tried to get in touch with Mr. Straus or the Gosman Ginger Ale Company but failed, and that about three days later he got Mr. Straus over the phone from Mr. Hamburger's office and had the fol-

lowing conversation with him.: "I asked Mr. Straus why he had refused to take in the car of bottles which had been shipped and which I understood were in the railroad yard at that time; why he said there had been such a long delay in the shipment of the bottles that he had gone on the outside, or the outside market, and bought the bottles elsewhere; he said he did not think he was going to get his bottles from us; I said, this is a peculiar method of handling this situation, how does it come you did not apprise us of the fact; he said, I did try to reach Mr. Hamburger on various occasions but I was unable to do so; I said, why, I do not see that Mr. Hamburger has anything to do with this matter whatever as to the delivery of the bottles; the contract was with us, the Keystone Bottle Co., and we were in Uniontown, Pennsylvania; you knew where we were and could have reached us by mail or could have reached us by telephone or telegram; he said, well, I may have been a little remiss in that respect and under the circumstances I will take in that car, but I will not take any more bottles now; incidentially I said, Mr. Straus, during the interim of the controversy between you and Mr. Hamburger regarding the change of the contract we had accumulated a carload of 16 ounce weight bottles, known in the trade as 16 ounce weight bottles and we would like to have you take that car in too in addition to your contract; he said, I can not take in any more bottles now, not at present, I am overloaded; I said, I just mention this now, we have this car of 16 ounce bottles and I would like for you to take them in at your convenience; he said he could not take in any now, he could not take any more on his contract now. He did not say anything about not taking the rest of the contract at all. After I got home, I received his letter of June 11th, and since then he had never taken any more bottles, though he did take and pay for the first shipment. The carload of 16 ounce bottles referred to in the telephone conversation were made up during the interval of Mr. Hamburger's discussion with Mr. Straus in regard to the change in the terms of the contract in regard to the weight of the bottles,

which resulted in the letter of March 29th." Mr. Coffin also testified "that neither the Gosman Ginger Ale Company nor Mr. Straus had ever complained of the quality, capacity or weight of the carload of bottles which they accepted and paid for, and that he had not at any time agreed to release the defendants from their obligation to take the balance under the contract. That the reference in the letter of June 9th, 1917, from the Keystone Bottle Manufacturing Company to 'causes and circumstances of the delay' alluded to the scarcity of labor in molding shops generally, owing to the laborers and mechanics going to munition factories, and the consequent delay in the remodeling of the molds; that the United States declared war April 6, 1917, a few days after March 29th, and delays in transportation were also common at that time, and the first shipment was made as soon as possible under the circumstances. That the plaintiff was ready, able and willing to deliver the remainder of the fifteen hundred gross in accordance with the terms of the contract, that the plaintiff's loss, due to the defendants' notice to the plaintiff that they considered the contract cancelled and to the refusal of the defendants to accept any more shipments under the contract, amounted to $2,622.96, said sum being the difference between what it would have cost the plaintiff to have manufactured and delivered the remainder of the goods called for by the contract of February 5th, 1917, as modified by the letter of March 29th, 1917, and the price of such goods as fixed by said contract."

Mr. Straus' testimony as to the conversation between him and Mr. Smart on the 15th of June is as follows: "On the morning of the 15th of June, I returned from Cleveland a little after 7 o'clock; I was at home between 8 and 9 o'clock, and Mr. Smart called me up at the house, and spoke to me about this car of bottles, and I told him—finally he said to me we are under considerable expense here with that carload of bottles, and I want you to do me a favor and take them; it is an expensive thing to have the bottles come here and stay here, and I want you to take the car of bottles; I then told

him, after talking over the phone, I would take the car of bottles providing they were of the weight we agreed on in the modified contract, but I would not take any more, and I would consider the contract cancelled, and if that was satisfactory · I would take the car of bottles; he said that is perfectly satisfactory, and I want you to give me some of your future business, and I then said I would not object to that; that is the entire conversation which passed between us; * * * that he told Mr. Smart at the interview the reason for refusing to take any more bottles was that the company had sufficient bottles; that not hearing from him they had been obliged to go into the market and buy them; * * * that he did not tell Mr. Smart in the telephone conversation that he would not take any more bottles now; that he told him that he would take the carload if they were of the weight agreed on, and he would not take any more, if Mr. Smart was satisfied with this, and would consider the contract cancelled, and that Mr. Smart agreed to this; that in the telephone conversation with Mr. Smart on June 15th, Mr. Smart asked about the carload of bottles, and witness told him they had been rejected. Mr. Smart replied that they had gone to considerable expense and the bottles were in Baltimore, and he wished as a favor that the defendants would take them; the witness finally told him that if they complied with the terms of the modified contract he would take them provided Mr. Hamburger agreed to cancellation of the contract as to the balance; that he explained that not having heard from Mr. Hamburger he had been obliged to fill his wants in the open market. Mr. Smart replied it was perfectly satisfactory, and he trusted I would give them some of our future business, which I said I surely would not object to. Mr. Smart said he would send the bill of lading and the invoice to the office and these were received."

The defendants accepted and paid for the carload of bottles shipped on the 7th of June, but refused to accept any more bottles under the contract, and this suit was brought

by the plaintiff to recover damages for an alleged breach of the contract by the defendants.

To the declaration, setting out the contract and the alleged breach thereof by the defendants, the defendants filed five pleas. The first and second pleas are that the defendants did not promise and were never indebted as alleged. The third plea alleges that the contract was cancelled by an agreement of the parties. The fourth plea is that after the delivery and acceptance of one carload of bottles, the plaintiff abandoned performance of the contract and the defendants assented thereto, and the fifth plea charges that the plaintiff defaulted in the performance of its contract, and in consideration of the defendants agreeing to accept one carload of bottles, the plaintiff agreed to cancel the contract, and the defendants did accept and pay for said carload of bottles.

At the conclusion of the testimony the plaintiff offered seven prayers: the first, second, fifth, sixth and seventh of which were granted; the Court below noting on the first prayer that it was granted in connection with defendants' first, second and fourth prayers. The defendants offered four prayers, all of which were granted in connection with plaintiff's first prayer, except the third, which was rejected. The reporter is requested in his report of the case to set out the plaintiff's first and seventh prayers, and defendants' first, second and fourth prayers, correcting the error in the record so as to make the note of the Court below on the plaintiff's first prayer refer to defendants' first, second and *fourth* prayers.

The verdict and judgment being in favor of the plaintiff, the defendants appealed.

The first twelve exceptions in the record are to the admission of evidence offered for the purpose of showing the meaning of the words "average 16 ounce weight" in the original contract, as understood by those engaged in the manufacture and sale of bottles. As we have stated, the original contract was modified by charging the specification in regard to the weight of the bottles, and it is conceded, or not denied, that

374 GOSMAN ALE CO. *vs.* KEYSTONE CO.

the bottles furnished under the contract as modified were satisfactory. The evidence referred to in these exceptions could not, therefore, have injured the defendants, and its admission could not constitute reversible error. *Carroll Springs Co.* v. *Schnepfe,* 111 Md. 429.

The thirteenth and fourteenth exceptions refer to the evidence of Mr. Smart, offered in rebuttal, denying that he made certain statements in his conversation with Mr. Straus tending to show that he agreed to abandon the further performance of the contract, and were not pressed in this Court.

The ruling of the Court below in granting the plaintiff's prayers, rejecting the defendants' third prayer, and granting the defendants' first, second and fourth prayers in connection with plaintiff's first prayer, and the action of the Court in overruling defendants' motion to strike out certain evidence, are made the subject of the fifteenth exception. In reference to this exception the appellants contend: (1) that the plaintiff's first and seventh prayers are bad because they instructed the jury that a shipment of the first carload of bottles "within a reasonable time under the circumstances" after March 29th was a compliance with the contract requiring it to be shipped "as soon as possible"; (2) that the plaintiff's first prayer ignores the evidence relied on by the defendants to show that the contract had been cancelled by agreement, or the performance thereof had been abandoned by the plaintiff with their assent, and (3) that the granting of the defendants' first, second and fourth prayers in connection with the plaintiff's first prayer made the instructions of the Court below confusing and misleading, and practically deprived the defendants of the benefit of their said prayers.

First.—As to the first contention, it would seem sufficient to say that the *only* evidence in the record bearing upon the question whether there was unnecessary delay in the shipment of the first carload of bottles is the evidence to the effect that the bottles were shipped "as soon as possible," and the jury, in determining whether the first carload was shipped "within a reasonable time," was confined to that evidence.

But we also think the prayers properly construed the contract. It is said in *Words and Phrases,* Vol. 1, 528, upon the authority of the cases there cited: "A contract by a manufacturer to furnish certain specified goods 'as soon as possible' means within a reasonable time, regard being had to the manufacturer's ability to produce them, and the orders he may already have in hand," and it is said on page 529, "The phrase 'as soon as possible,' in an insurance policy requiring that notice of loss, accident or death should be given to the insurer as soon as possible, means with due diligence, or without unnecessary procrastination or delay under the circumstances of the case." In the case of *Edwards* v. *Balto. Fire Ins. Co.,* 3 Gill, 176, the Court said: "To enable us to judge of the correctness of the Court's conduct, in granting this prayer, the meaning of the terms, 'forthwith,' and, 'as soon as possible,' as used in the policy of insurance, ought to be ascertained. To give to them their literal import, would, in almost every case of loss by fire that occurs, strip the insured of all hope for indemnity for the loss incurred; and policies of insurance against fire, would, as to the insured, instead of being contracts of indemnity, as they profess to be, become engines of fraud and injustice in the hands of the underwriters, and a recovery by the insured, would be rarely, indeed, if ever practicable. Such a construction, therefore, has not been sanctioned by courts of justice. The true meaning of those terms is, with due diligence, or without unnecessary procrastination or delay, under all the circumstances of the case. See *Inman* v. *Western Fire Ins. Co.,* 12 Wendell, 461, where it was determined that, 'forthwith,' in such a policy, imposes upon the insured nothing more than what is called due diligence under all the circumstances of the case; and *Cornell* v. *LeRoy,* 9 Wendell, 166, where it was decided, that 'the assured is, as soon after the fire as possible, to deliver in a particular account of such loss or damage, and this means no more, than it is to be done with due diligence, under all the circumstances of the case; there is to be no unnecessary procrastination or delay.' In all ordinary cases,

whether due diligence has been used by the insured, or he has been guilty of no unnecessary procrastination or delay under all the circumstances of the respective cases, are questions of fact to be determined by a jury. We cannot assent to the proposition contended for by the appellees, that the same transmission of notice of loss necessary to constitute due diligence on the part of the insured in this case, that according to '*The Law Merchant,*' and an unbroken chain of decisions of courts of justice, is deemed due diligence by the holder of a bill of exchange or promissory note, seeking to charge those contingently liable for the payment thereof, viz: that notice must be transmitted to those sought to be charged by it, by the next mail after the dishonor of the bill or note. Such a rule, as an unbending principle of law, has not, and we think ought not, to be applied to contracts like that now before this Court." In the later case of *Providence Ins. Co.* v. *Martin,* 32 Md. 310, the Court said: "The construction of the terms 'forthwith' and 'as soon as possible,' in a similar condition in a fire policy, with reference to notice and furnishing preliminary proofs of loss, has been settled in this State by the decision in *Edwards* v. *Balto. Fire Ins. Co.,* 3 Gill, 187." As pointed out in *Edwards* v. *Ins. Co., supra,* and as indicated by the authorities cited by the appellants, there are cases in which the words "as soon as possible" may be given, and have been given a different construction, but in a contract like the one under consideration we think the construction given them in the prayers more in accord with the intention of the parties, especially in view of the statement in the contract of their understanding "that date of shipments are approximate."

Second.—The first prayer, as granted by the Court in connection with the defendants' first, second and fourth prayers, is not open to the objection urged by the appellants. If the plaintiff's first prayer had been the only instruction granted by the Court there would be force in the appellants' contention. But this Court has repeatedly said that in passing upon the instructions of the lower Court, the granted prayers

should be read together.  *Gill* v. *Staylor,* 93 Md. 471; *Wood-ward* v. *Tyng,* 123 Md. 119; *Hochschild, Kohn & Co.* v. *Cecil,* 131 Md. 70.  In the case of *Woodward* v. *Tyng, supra,* the Court said: "Objection has been made by the defendant to the granting of the third and fourth prayers of the plaintiff, because of the fact that these prayers did not embody the contention of the defendant as to the cancellation of the contract by use of the long-distance telephone; but that aspect of the case was fully covered by the 17th prayer of the defendant.  Both parties were entitled to have their respective theories of the case presented to the jury by the instructions of the Court; had the defendant offered no prayers there would be force in the contention of the defendant that the granting of the third and fourth prayers of the plaintiff was a segregation of their case to the prejudice of the defendant; but inasmuch as the defendant had offered a prayer upon this very subject, the criticism now made of the plaintiff's prayer is unsound."  In the case at bar, the learned Judge noted on the plaintiff's prayer that it was granted in connection with the defendants' prayers, the effect of which was to call the jury's attention to the evidence relied on by the defendants, and to instruct them that notwithstanding they found the facts set out in the plaintiff's prayer, if they also found the facts stated in the defendants' prayers their verdict should be for the defendants.  This method of instructing the jury is in accord with the practice in this State, and is recognized in *Robinson* v. *Silver,* 120 Md. 47, and *B. & O. R. R. Co.* v. *Whitehill,* 104 Md. 303.

Third.—The third contention of the appellants presents a somewhat different question.  The facts stated in their first, second and fourth prayers, if found by the jury, would have constituted a complete bar to a recovery by the plaintiff, and it was not necessary in granting them to note on the prayers that they were granted in connection with plaintiff's first prayer.  But as all of the prayers were to be considered by the jury together, the fact that the Court below noted on the defendants' prayers that they were granted in connection with

plaintiff's first prayer could not have confused or misled the jury, as the plaintiff's prayer limited the finding of the jury to "the issues joined on the first and second pleas of the defendants," while the defendants' prayers instructed them that if they found the facts therein stated their *verdict* should be for the defendants. While it was not necessary to note on the defendants' prayers that they were granted in connection with the plaintiff's first prayer, and it did not tend to simplify the instructions of the Court, we would not, under the circumstances, be justified, in view of the conclusion of the plaintiff's first prayer, in holding that the action of the Court misled the jury and deprived the defendants of the benefit of their prayers.

No special objection is urged against the other prayers of the plaintiff, and the defendants' third prayer is covered by the plaintiff's second prayer, which was granted.

We have considered the ruling on the prayers notwithstanding the exception includes the ruling of the Court on the motion of the defendants to strike out certain evidence, and notwithstanding this Court has repeatedly called attention to the rule which requires a separate bill of exceptions for each ruling of the Court excepted to, the action of the Court on the prayers being regarded as a single act. *Morrow Brothers* v. *Arthur and Boyle*, 134 Md. 182.

No question was raised in the Court below, or in this Court, as to the right to sue the Gosman Ginger Ale Company and William L. Straus together, and it follows from what has been said that the judgment appealed from must be affirmed.

*Judgment affirmed, with costs.*