# H. W. WEBB-PEPPLOE *v.* ISAAC N. COOPER.
## [No. 41, April Term, 1930.]

*Decided June 24th, 1930.*

The cause was argued before BOND, C. J., ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Philip B. Perlman* and *Joseph T. England,* with whom were *Fendall Marbury, Robert D. Bartlett,* and *Wirt A. Duvall, Jr.,* on the brief, for the appellant.

*Edwin T. Dickerson* and *Harry W. Nice* for the appellee.

PARKE, J., delivered the opinion of the Court.

The plaintiff lived on the west side of Charles Street, between Overhill and Warrenton Roads, and was driven home at about half-past twelve in the morning of October 31st, 1928. The automobile drew up to the gutter on the east side of Charles Street and stopped about opposite the entrance to plaintiff's residence. He got out of the automobile, and his place on the right front seat was then taken by the father of the young woman who was driving; the door to the automobile was closed and, after they had said goodnight, the automobile left, with the plaintiff standing in the gutter on the east side of the street. The street at this point was thirty-four feet wide, and was a macadam roadway. It was a clear moonlight night, and the street lamps were burning. The plaintiff is sixty-nine years of age, and was an active man in excellent health, with good hearing and eyesight, and in the full possession of all his faculties, at the time of the wrong alleged. According to his own testimony, after the automobile had gone ten or fifteen feet northward, he went across the street, looked both north and south, and heard no signal and saw no automobile headlight, although he continued to look to his right and left as he crossed the street at an ordinary gait, when, in his own language, "All of a sudden—I must have been almost in my gutter—I couldn't have been very far away, and something struck me an awful blow, and I grabbed something and held on until it got so hot it burned me, and I had to let go. I don't know how long it was, but it was awful hot, and then I must have lost consciousness."

The plaintiff had been struck by the right front part of the automobile of the defendant, and, when it was brought to a stop, the plaintiff was lying on the ground between the

428

gutter and the right back wheel of the automobile. None of the three parties who were in the automobile, in which the plaintiff had ridden from a business meeting to his home, saw what happened, and no eyewitness of the tragedy testified, except the defendant, and two young women who were driving north on Charles Street and saw what occurred. The testimony of the two disinterested witnesses was to the effect that the plaintiff began to walk across the street back of the automobile in which he had arrived, as it moved away from the gutter towards the line of travel of the northbound traffic, and, emerging from the line of the defendant's obstructed vision that was caused by the diagonal movement of the receding automobile, the plaintiff, when near the center line of the street, and as the defendant's automobile, which was being driven south on its side of the road, was almost in line with him, broke into a run and went directly in front of the approaching automobile, which immediately swerved to the right to avoid the collision and struck the plaintiff while making this movement. The defendant's testimony is that he did not see the plaintiff until within five or ten feet in front of defendant's automobile, when, from behind a northbound automobile, the plaintiff suddenly appeared, midway between the headlights on defendant's car, with legs apart as if in the act of running or jumping. The defendant immediately applied his brakes, turning to the right, and almost instantly struck the plaintiff. The automobile was brought to a stop about three feet from the cement gutter on the west side of the street.

The defendant's testimony submits a coherent theory of how the collision took place, but, in considering the demurrer to the evidence, this version must be rejected; and all the testimony and rational inferences which support the plaintiff's right to recover must be accepted. There is testimony on the record legally sufficient to establish that the defendant was driving at an excessive rate of speed at the time the plaintiff was injured, and that his brakes were not working properly, and that he did not sound his horn nor give any other audible signal of his approach. So, in the absence of

some imprudent act of the plaintiff which is so distinct, prominent, and decisive that the common mind of reasonable persons would unequivocally declare it to be the negligent act without which the injury would not have been inflicted, the question of the plaintiff's right of recovery would not be one of law for the court, but an issue of fact for the jury. *Ottenheimer v. Molohan,* 146 Md. 175, 186.

The testimony of the plaintiff is that he looked to the north and to the south after the automobile from which he had alighted had gone ten or fifteen feet, and that he neither saw nor heard any approaching automobile. He then walked across the street, and, as he proceeded, he continued to look to the north and to the south, and he neither saw nor heard the approach of the automobile which struck him. So totally unaware was he of the presence of the automobile that he was unable to testify what struck him, although his own testimony is that from where he crossed he could see a mile to the north along the highway he was traversing.

The defendant was driving a Cadillac touring car with headlights brightly burning. The street was lighted by arc lights on either side, and it was a clear moonlight night. After the plaintiff crossed the center line of the street there was no automobile to obstruct his view, whose extent is clearly shown by the photographs offered in evidence. The automobile in which plaintiff had been riding was passed by defendant's near the parked plot bound by the intersecting lines where Charles Street, Greenway and St. Paul Streets unite. This was about 173 feet from where the plaintiff got out, so that this northbound automobile had proceeded about 158 feet after the plaintiff began to go across the street, which required four seconds at the highest rate of speed the driver testified the automobile was driven. In this four seconds the plaintiff had a full view to the north of the southbound automobile travel and, if walking at the slow rate of three miles an hour, the plaintiff at the end of the four seconds would have been half-way across the street when the defendant's automobile and the one in which the plaintiff had ridden passed each other at least 173 feet from the point of the acci-

dent. The driver of the northbound car estimated the speed of the defendant's car when it passed at over forty miles an hour. An opinion of the rate at which an automobile is moving under the circumstances obtaining at the time was no more than an estimate, and may have a large factor of error, although there may be no doubt, as in the instant case, that the speed was excessive. If, however, it be accepted that forty miles an hour was the rate, and that this speed was maintained, it would have taken three seconds for the automobile to have reached the point where the accident took place, so there were seven seconds in which the defendant's automobile was in sight. When, therefore, the plaintiff testified that he looked and did not see the brightly beaming headlights of the defendant's automobile on a clear moonlight night, when if he had looked he must have seen the rapidly approaching car at excessive speed in time to avoid the accident, the court will reject the testimony as unworthy of consideration. *Sullivan v. Smith,* 123 Md. 546, 556; *Askin v. Moulton,* 149 Md. 140, 143; *Gilomir v. United Rys. Co.,* 157 Md. 464, 467. Under the circumstances but two alternatives are possible. The one is that the plaintiff either imprudently did not look when it was his duty to look; and the second is that, looking, he saw and then rashly adventured to make his passage in the face of its obvious peril. The plaintiff's attempt was all the more culpable because the statutory rule of the road was that vehicular traffic between street crossings shall have the right of way over pedestrians. Code, Supp. 1929, art. 56, sec. 209, p. 344; *Buckey v. White,* 137 Md. 124, 129. While this statutory provision is not alone sufficient to establish contributory negligence, as was decided in *Nelson v. Seiler,* 154 Md. 76 (compare *Consol. Gas etc. Co. v. Rudiger,* 151 Md. 226, 236.), yet it serves to give character to the plaintiff's act and is a pregnant circumstance, because the statutory rule imposed upon such pedestrians an added degree of responsibility, and so, of care, in looking for approaching automobiles on that portion of the highway of cities and towns between intersecting streets. The statute is a legislative recognition of the danger of vehicular traffic to pedestrians in passing

across the streets of cities and towns, and an effort to diminish the number of injuries and fatalities from this source by giving the pedestrian the right of way at street crossings in towns and cities, and by conferring upon vehicular traffic the right of way over pedestrians crossing such streets between the public crossings.

The automobile driver had the right to expect every pedestrian to yield him the right of way, but this did not relieve him of the obligation of using due care according to the circumstances. In the instant case the imminent peril to the plaintiff was the excessive speed at which the automobile was moving. The pedestrian had a right to base his movements upon the hypothesis that the approach of the automobile was at a rate within the law, only so long as he remained ignorant of its actual excessive speed of approach. *Taxicab Co. v. Ollenritter,* 151 Md. 525, 532. The fact that the defendant was negligent does not relieve the plaintiff of his duty to use due care and caution nor relieve him of the consequences of his failure so to do. *Glick v. Cumberland & W. Elec. Ry. Co.,* 124 Md. 308, 319. Not only was the automobile visible, but, on testimony offered by the plaintiff, its approach at an excessive speed was apparent, so, if the plaintiff had looked before moving from his place of safety east of the center of the street, he would have seen not only the approaching automobile, but also its excessive and dangerous speed, in time to have avoided the accident by simply stopping and letting the automobile pass on its side of the road. *Slaysman v. Gerst,* 159 Md. 292; *Colgate & Co. v. United Rys. Co.,* 156 Md. 472, 475, 476, 477; *Consol. Gas etc. Co. v. Rudiger,* 151 Md. 226, 239; *Fulton Building Co. v. Stichel,* 135 Md. 542, 549, 550; *Washington, B. & A. R. Co. v. State,* 140 Md. 115, 118; *Baltimore Traction Co. v. Helms,* 84 Md. 515, 524-526; *Maryland Elec. Ry. Co. v. Beasley,* 117 Md. 270, 279; *Peterson v. Ballantine & Sons,* 205 N. Y. 29; Swetzoff v. *O'Brien,* 226 Mass. 438; *Moran v. Smith,* 114 Me. 55.

The negligence of the plaintiff supervened and actually continued to the point of the collision, and so became a concurring proximate cause of his harm. Moreover, the plain-

tiff's default in failing to see, or in ignoring, the impending peril of going across the west half of the street in front of an automobile approaching at a visibly excessive speed, is so distinct, prominent, and decisive an act of contributory negligence as to afford no basis for ordinary minds to differ as to its nature and effect. It follows there was an error in the trial court's refusal to grant defendant's prayer taking the case from the jury on the ground of contributory negligence.

*Judgment reversed without a new trial, with costs to the appellant.*

OFFUTT, J., filed a dissenting opinion, as follows:

Charles Street in Baltimore City, running north and south, continues in a northerly direction as Charles Street Avenue until it intersects the Joppa Road in Baltimore County. From the University Parkway north, the adjacent development is suburban in character, such buildings as there are, are located on lots of considerable area, and as one continues to go north the surrounding country becomes more and more rural. A few blocks north of the University Parkway, Charles Street Avenue at Charlecote Street bends sharply in a northwesterly direction for a few hundred yards, and then it curves again and proceeds in a northerly direction for several hundred yards to a point where it intersects, first, Greenway Street on the east, and then St. Paul Street, coming into it at an angle on the east and Overhill Road on the west. Two hundred and sixty-one feet south of Overhill Road on the west side of Charles Street is the entrance to the residence of Isaac N. Cooper. Charles Street at that point from building line to building line is about fifty-six feet wide. On either side next to the roadway, which is thirty-four feet wide, is a strip of green sward six feet wide on the west and seven feet wide on the east side of the avenue, and adjacent to it, and lying between it and the respective building lines, are two cement sidewalks, each four and one-half

feet wide. On either side of the roadway is a line of street lights, extending north beyond the Cold Spring Lane, which itself is considerably more than a city block north of Overhill Road. At Cold Spring Lane there is a sharp dip in the road, which hides vehicles coming south on Charles Street Avenue from the sight of one standing south of Overhill Road.

On the evening of October 13th, 1928, Isaac N. Cooper, aged about sixty-nine years, a builder by occupation, attended a building association meeting. After the meeting, John Gablein, who with his wife and daughter were present, offered to take Mr. Cooper to his home in his, Gablein's, car. Mr. Cooper accepted, and went as far as his home on Charles Street Avenue in the Gablein car. His home, as stated, was located on the west side of the avenue, and the car, which was driven by Mrs. Henry H. Helmbright, Mr. Gablein's daughter, stopped on the east side of the avenue, opposite Cooper's residence. It remained there long enough for Mr. Gablein to change his place in the car from the rear to the front seat. Mr. Cooper stood in the gutter on the east side of the street until the Gablein car had started off and reached a point at or about Greenway Street, one hundred and fifty-seven feet north of where he was standing. He then looked to his right and left and, seeing no automobile approaching, attempted to cross the street, and reached the extreme west side of it, when he was struck by an automobile operated by H. W. Webb-Pepploe, proceeding south on Charles Street Avenue at a high rate of speed, and severely injured. The weather was clear, the roadway was dry, and the moon was shining. The evidence in the case, in my opinion, permits the inference that the Pepploe car was being driven at from forty to sixty miles an hour. The defendant himself testified that, as he approached the point at which the accident occurred, he met three cars going north, that "just at the moment of passing the third car, the first intimation that I had of any possibility of an accident was, a short distance ahead of my car lights, I saw a man's legs wide apart. I am frank to confess that I couldn't tell whether the man was five feet or ten feet in front of me. I realized my car, well,

any car going thirty-five miles an hour—rather going twenty-five miles an hour—goes around thirty-eight or forty feet in a second. It's awful difficult to tell how long it takes to cover anywhere from five to ten feet. The first intimation, as I was just passing the third and last car, I saw this man's legs spraddle, as though he were in the act of running or jumping. My foot was still on the accelerator of the car, when I saw clothes up on my radiator cap." His statement that he saw the man immediately after he passed the third car is contradicted by other witnesses, who testified that the Gablein car had reached Greenway Street when Pepploe's car met it. Skid marks on the surface of the street indicated that the car went ninety to one hundred feet after the brakes were applied hard enough to make such marks before it stopped, and Pepploe, when George C. Cooper, the brother of the injured man, said to him, "you were going about sixty miles an hour," replied, "I was going a little fast or very fast," and later the witness said Pepploe answered, "I was going very fast." It further appeared that the brakes on Pepploe's car were in a defective condition; that he sounded no bell or horn as he passed Overhill Road or Greenway Street; that there are at those places no definite crossings; and that the distance between Overhill Road and the next intersecting road, Warrenton Road, which does not cross Charles Street, but intersects it on the west side, is about eight hundred feet. Upon these facts the majority opinion holds that in attempting to cross the road, Cooper was guilty of such contributory negligence as barred his right to recover in this case. I have been unable to concur in that conclusion for the following reasons:

As has been stated, the distance between road intersections at the point where the accident occurred is so great that to charge one attempting to cross the highway between such intersections with negligence in law, is, in my judgment, an unreasonable construction of the statute which gives to pedestrians the right of way at street crossings and to automobiles the right of way between street crossings, in that it requires an inference of negligence to be drawn from the fact that a

pedestrian is struck between street intersections by a vehicle approaching from his right, regardless of any other fact or circumstance. To require a pedestrian to walk a quarter of a mile in order to cross a highway some thirty-four or five feet wide, when as a matter of fact the intersections may be quite as dangerous as the space between them, seems to me not to be required by either the letter or the spirit of the act.

Moreover, it cannot be assumed as a matter of law that Cooper testified falsely when he said he looked to his right and left before crossing the street and could see no automobile approaching. At least one of the occupants of the Gablein car testified that, before their car was started, no machine was visible on the road and it had proceeded nearly as far as the corner of Greenway Street, or about one hundred and fifty feet, when Pepploe's machine met it and it was about that time that Cooper started to cross the road. When it is considered that a car travelling at sixty miles an hour would go eighty-eight feet a second, and that hardly more than two seconds could have elapsed from the time Pepploe's car passed the Gabelin car until it struck Cooper, it may well be that, when Cooper looked to his right, it had not come in sight over the rise at Cold Spring Lane. It must also be remembered that Cooper was charged with the duty of looking not only to his right, but to his left, and that in looking to his right he was facing long lines of street lights, not altogether unlike automobile headlights in their appearance, some of which must have been on a plane with the lights of Pepploe's machine, and to have charged him with contributory negligence as a matter of law because under such circumstances he did not see that car, approaching at sixty miles an hour, is in my judgment inconsistent with the law of contributory negligence as established in this state. Cooper had the right to assume that no car would be operated over the highway which he was crossing at any such speed, and he was further justified in assuming that any car operated in any such an insane manner would give at least some warning of its approach, which was not done in this case.

To cite many cases upon a principle of law so long and firmly established would be a mere waste of time, but reference to two will serve to illustrate my position.

In *Mears v. McElfish*, 139 Md. 83, it is said: "The driver of the automobile was obliged to anticipate that pedestrians might be using the thoroughfare. It was especially incumbent upon him to exercise reasonable care to avoid injury to travelers, who, out of regard to their own safety, would naturally make use of the unpaved margin. The fact that the headlights on the automobile approaching from the city may have made it more difficult for the driver of the defendant's car to see the pedestrians on the side of the road, did not relieve him of the duty to use proper care to observe their presence. If he could not see them because of any insufficiency of his own headlights, or because of the glare of those on the approaching car, he might have reduced the speed of his automobile and given warning signals to any one possibly exposed to the danger of collision."

In *Waltring v. James*, 136 Md. 407, the facts were that the plaintiff was returning from the race track at Havre de Grace to the Pennsylvania Railroad station, and while crossing the driveway leading up to the station was struck by defendant's automobile. He testified that, before attempting the crossing, he looked down the street and there was no machine, and that he didn't remember getting over the road. There was also evidence in the case that there was no horn blown or warning given of the approach of the automobile which hit him. That was in broad daylight, and there was testimony there (as here) that the automobile was driven at an excessive rate of speed. Upon those facts the court reiterated what has so often been announced, that "unless the acts and conduct of the plaintiff relied on as amounting in law to contributory negligence is established by clear and uncontradicted evidence, the case should not be withdrawn from the jury, and that when the nature of the act relied on to show contributory negligence can only be determined by all the circumstances attending the transaction it is within the province of the jury to characterize it." And the court held

that under the facts in that case the question of contributory negligence was for the jury.

To hold in this case that the act of a man in the full possession of his senses attempting to cross a lighted highway on a bright moonlight night was guilty of contributory negligence as a matter of law, because he did not see, in time to avoid it, an automobile approaching him at sixty miles an hour without warning of any kind, and when the headlights of the approaching automobile may naturally and readily have been confused with the converging lines of street lights on either side of the road in the direction from which it was coming, and which struck him while he was on the extreme edge of the road, in my judgment, is contrary to the settled law of this state. In effect the rule announced exonerates persons operating automobiles from liability for any injuries occasioned by their operation thereof, no matter how negligent or reckless, if the accident occurs between road intersections. Because if the person injured sees the approaching car and fails to avoid it, he is guilty of contributory negligence as a matter of law, and if he fails to see it he is equally guilty. The thing that conclusively establishes his negligence is the fact that he was hit. He cannot recover without proving that he was hit, but as soon as he shows that fact he establishes his own guilt, and exonerates the defendant. That in my opinion is contrary to the law announced in *Nelson v. Seiler*, 154 Md. 68.