COUNTY COMMISSIONERS FOR ANNE ARUNDEL
COUNTY *v.* MYRTLE VANSKIVER.

[No. 16, January Term, 1934.]

*Decided April 3rd, 1934.*

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Digges, and Parke, JJ.

*Benjamin Michaelson* and *James P. Kelley,* with whom was *John Grason Turnbull* on the brief, for the appellant.

. *J. Fletcher H. Gorsuch, Jr.,* with whom were *Stein & Hochman* on the brief, for the appellee.

Digges, J., delivered the opinion of the Court.

At the trial of this case for personal injuries, the only reviewable exception was taken because of rulings on proposed instructions to the jury. The verdict was in favor of the plaintiff, and the appeal is from the judgment entered on that verdict.

The plaintiff was injured when the small motor truck in which she was a passenger overturned, as it was proceeding along a public highway known as the Tickneck Road in

Anne Arundel County. A portion of the highway had been improved by the substitution of concrete paving for the pre-existing gravel surface. About three weeks before the accident a completed section of the new roadbed had been opened to public travel. As the improved section was higher than the old roadbed, it was necessary to raise the level of the unimproved part of the road at the point where the concrete construction ended. This was accomplished, on the day before the accident, by the deposit of sand and gravel upon that portion of the old gravel roadbed immediately adjoining the concrete construction for a distance of twenty-five feet along the county road. The evidence on behalf of the county, as shown by the testimony of the road engineer and the supervisor, is to the effect that six truck loads, each containing three cubic feet, were deposited on the county road beginning at the end of the concrete and running with the length of the gravel road for a distance of twenty-five feet, thereby producing a new surface on the county road composed of sand and gravel to the depth of six inches. We mention this testimony and accept it as being conclusive, for the reason that the testimony on behalf of the plaintiff in this regard is so inherently improbable that by the common knowledge and experience of mankind it must be rejected. Nowhere in the evidence on behalf of the plaintiff is there direct testimony as to the depth of the loose sand and gravel on the county road at the point of the alleged accident, but we are asked to infer, from the positive testimony by the driver of the truck and the husband of the plaintiff, that, immediately upon the truck's front wheels passing from the concrete onto the gravel, those wheels sank in the sand and gravel to the depth of eighteen inches, as testified by the driver of the truck, or from eighteen to twenty inches, as testified by the plaintiff's husband, that the sand and gravel placed thereon by the county commissioners was eighteen or twenty inches in depth.

The record conclusively shows that the injury to the plaintiff was caused by the truck in which she was riding as a

passenger overturning or capsizing after it had left the state road, constructed of concrete, and gotten on the gravel surface maintained by the county commissioners. There is evidence from which the jury might find that the bed of the county road at the point of the accident was approximately three or four feet above the level of the field along the right side of the road; and it is conclusively shown by the testimony of both the plaintiff's and defendant's witnesses that the truck in which the plaintiff was riding turned over and slid down onto the level of the field, beyond a telephone pole which was located alongside of the gravel road at a distance of at least twenty feet from the end of the concrete. Accepting, as we must, that testimony, which is not denied by the plaintiff, the testimony of the driver of the truck and the plaintiff's husband to the effect that the front wheels sank in the gravel to the depth of at least eighteen inches, while the rear wheels of the truck remained on the concrete, cannot possibly be true. The plaintiff's witnesses having previously testified that the truck was a 1915 Model T Ford, old and "dilapidated," and that at the time it left the concrete it was being driven at not over ten or twelve miles an hour, it is impossible for any reasonable man to believe that such a truck, driven at that rate of speed, with its wheels buried in loose sand and gravel the depth of eighteen inches, could continue to proceed through such material for the space of twenty feet to the point where it overturned. If the wheels were buried to such a depth, either one or both of the front wheels, it would have sunk to the level of, if not above, the front axle, with the hind·wheels of the truck still on the concrete, and leaving, as testified to by the plaintiff's witnesses, the body of the truck on an angle of forty-five degrees. It requires no further argument to show that such testimony is not such that an inference can be deduced that the depth of the sand and gravel was eighteen or twenty inches. In other words, when the plaintiff's witnesses testified as to the type and condition of the truck, the rate of speed at which it was running at the time the front wheels

left the concrete, resulting instantly in the sinking of one or both of the front wheels to the depth of eighteen or twenty inches, it would be physically impossible for it to proceed to the point where it admittedly overturned. We, therefore, have a case wherein the jury could find from the testimony on that point that the sand and gravel was six inches in depth; and there is no inference that the jury could properly draw that it was of a depth of eighteen or twenty inches.

The testimony of the truck driver as to the circumstances of the accident is thus, in part, summarized in the record: "That on June 21, 1930, he was bound in a Model T Ford truck to spend the week end with a friend in Anne Arundel County. * * * That the truck had a high, solid back cab, and Mr. Vanskiver, the husband of the plaintiff, was seated with him on the front seat. That the plaintiff was sitting in the rear of the truck, on boards that ran across from one side of the truck to the other, with a certain Mrs. Banks and Mrs. Vanskiver's five children. * * * That as he approached the point where the accident happened, he noticed the road had been loamed and stoned at the end of the concrete and that the road bed consisted of gravel and dirt where the concrete stretch stopped. That as he reached the end of the concrete road, he was driving around ten or twelve miles an hour." The further testimony of the witness is reproduced *verbatim* in the record, and we quote from it as follows:

"Q. What did you do as you left the concrete road? A. My front wheels buried down, I should say, a foot and a half. Q. That was where with respect to where your front wheels left the concrete? A. That is where we hit the stone and sand. Q. Right at the edge of the concrete? A. Yes. * * * Q. Upon what side of the road were you driving at the time? A. On the right hand side. Q. When your front wheels buried down you say about a foot and a half, tell us where your hind wheels were at that time? A. They seemed to be on the concrete road. * * * Q. When they buried down, you say the hind wheels were still on the concrete, what happened to the front wheels of the truck? A.

They twisted around and twisted the steering wheel out of my hand. Q. Then what happened? A. The front wheel on the right side gave under and that caused it to tumble. Q. To what extent did it give under? A. I should say forty-five. * * * Q. Which way did the truck turn? A. On the right side. Q. As the truck turned on the right side, how close was it to the bank at the road side? A. It hit the edge of the bank and then slid. Q. Where did it slide to? A. It slid down until it hit solid ground. Q. Did you notice afterwards how high that bank was? A. I should say three or four feet. Q. Did you notice afterwards what that bank was constructed of? A. Sand and gravel. Q. The whole three or four feet? A. Yes, it looked apparently that way."

On cross-examination the witness testified that he had been driving a car about twelve years; that he had never before driven over the road on which the accident happened, but had previously traveled over it about a dozen times with other persons, the last occasion prior to the date of the accident having been about two months before its occurrence; that the truck which he was driving at the time of the accident was a 1915 model; and that he first saw the gravel road at the distance of 150 yards, when he was driving toward it on the concrete portion of the road. "Q. Did you notice anything unusual as you saw it there? A. It looked apparently as level as the concrete road. Q. Right flush with the concrete road? A. Yes. Q. Did you lose control of the wheel? A. When she started to bury to sink, it wrenched the wheel out of my hand and then I noticed it started to give on the right side and the wheel caved down. Q. Did the wheel break down? A. Yes, that is what caused the accident, when she dropped in that sand, the sand twisted it around and caved it in. Q. When you say 'dropped' what do you mean? A. When it started to sink. Q. You mean the car sank through the gravel? A. No, sir; the front wheel when it hit the gravel it sank in the gravel, that is what caused the wheel to wobble and twisted the wheel out of my hand. Q. How far had you got on the road before the wheel

mashed? A. Half the length of the truck and twisted the wheel out of my hand. Then it seemed to be high in the back and lower in the front and then when the wheel caved in dropped on the right side all at once. Q. When the wheel caved you tumbled all the way over? A. Yes. * * *"

On redirect examination the witness testified: "Q. Was there any change in the grade of the Tickneck Road at the time of the accident between the time you first went over it several months ago and this particular day? A. Yes, it had been graded. Q. How much grading had been done, how high had it been raised? A. I would say about four feet. Q. That was up to the edge apparently of the new concrete? A. Yes."

The plaintiff's husband testified that "he was sitting in the front seat on the right side of the truck which Mr. Anderson was driving"; that "he had been over that road many times prior to the accident, but that they had discontinued the use of the Tickneck Road for about three months because of construction work, and that this was the first time they had been over this road since the construction had started"; that "at the time of the accident the Tickneck Road was a new concrete road and prior to the new construction had been an old hard gravel road"; that "the new concrete construction extended from one half to one mile and that where the concrete and new construction stopped, the character of the road, continuing on, was dirt and gravel"; that "the continuation of the road looked fairly good and was perfectly level with the concrete"; and that "the day on which the accident happened was a wonderful day in June, Saturday, about 3.30."

"Q. As your truck passed from the improved concrete portion of the road on to the gravel and loam you have mentioned, what occurred? A. The front wheel descended into soft loam and gravel, causing the rear end of the truck to be left on a degree of about forty-five in the rear, and that threw all the weight front,—the way I saw it, to the front of the truck, twisting the wheel out of Mr. Anderson's hand

and of course throwing all that weight on the front right wheel, which caused that wheel to go over and sink. Q. Which wheel was that? A. The front right wheel. Q. How soon after the front wheel left the concrete and struck the dirt part of the road was it that the wheel went down? A. Instantly, just immediately when the wheel left that weight down. Q. Can you tell us approximately what depth that descended? A. Well, from eighteen to twenty inches. * * * Q. Now, then, when the right front wheel crashed or broke, what did the truck do then? A. The truck capsized. Q. Turned over? A. Yes. Q. At that time, immediately preceding the crash, at what side of the road was the truck being driven by Mr. Anderson? A. The right hand side. Q. How many feet from the extreme right edge of the road? A. About two feet or so. Q. When the truck turned over where did it land? A. It went on its right side and hit the edge of the bank and continued on down until it hit the field. Q. What was the approximate height of the bank at that point? A. I would say from three to four feet. Q. Mr. Vanskiver, had there been any change that you observed in the grade of that road at the point of the accident between the time you had last been over it three or four months prior and the day of the accident? A. Oh, considerable. Q. Tell us what that change was as it appeared to you? A. The road had been lifted to the extent of three feet or so."

From the cross-examination of this witness the following questions and answers are quoted: "Q. You say as soon as the wheels of the truck in which you were riding touched the gravel that the axle or the wheels went down from eighteen inches to two feet? A. Yes. Q. Did the truck keep on going at that time? A. No, the truck stopped. Q. How much did you pass the telephone pole before you went over the bank? A. The road was not altogether opposite that, the road was away from that. Q. Did you go down this side of the telephone pole or the other side? A. No, the far side. Q. That is how far from where the concrete and gravel join? A. Well, a couple of feet, I guess. Q. Only

two feet? A. A couple of feet, a foot or so. Q. If I tell you the distance from where these two roads join to where the telephone pole is, it is at least twenty feet, would you say that is correct or not? A. I would not say that is not correct. Q. The truck went behind the telephone pole before you tumbled over? A. It was behind the telephone pole. Q. If the telephone pole is twenty feet from where the two roads join, your truck must have gone twenty feet? A. The truck didn't go that. Q. It went behind the pole? A. Yes. Q. You mean to tell his Honor and the gentlemen of the jury that, after the front wheels of this truck sunk eighteen inches to two feet, it went along the gravel road to the telephone pole, a distance of twenty feet before it upset? A. That is correct. * * * Q. Was this concrete road still in the course of being finished? A. From my observation they had completed what they had intended to do. Q. You mean the concrete road was completed? A. As far as they intended to go, it looked to me like."

As stated, it was testified for the defendant by the county roads engineer and by a road foreman that sand and gravel were spread on the old roadbed to a depth of approximately six inches, and for a distance of twenty feet, to raise it to the level of the concrete section which had just been finished. It is inferable from their testimony that they depended upon the traffic over the highway to compact the leveling material. In the interval between the completion of the grading work and the accident on the following day, hundreds of motor vehicles are said to have passed over the road.

In this class of cases it is incumbent upon the plaintiff to allege and prove negligence on the part of the defendant, which in this case is alleged to be the unsafe construction or repair of the county road by the county commissioners. The general rule is that a municipality is charged with the duty of exercising ordinary care to so construct and maintain its public highways as to render them reasonably safe for ordinary travel. A breach of that duty imposes legal liability for all damages which are thereby proximately

caused. *Lashley v. Dawson,* 162 Md. 549, 160 A. 738; *Baltimore v. Poe,* 161 Md. 334, 156 A. 888; *Baltimore County v. Collins,* 158 Md. 335, 148 A. 242; *Washington, B. & A. Ry. Co. v. Cross,* 142 Md. 500, 121 A. 374; *Charles v. Baltimore,* 138 Md. 523, 114 A. 565; *Kent County v. Pardee,* 151 Md. 68, 134 A. 33; *Annapolis v. Stallings,* 125 Md. 343, 93 A. 974; *Baltimore v. Bassett,* 132 Md. 427, 104 A. 39; *Biggs v. Baltimore,* 129 Md. 686, 99 A. 860; *Hagerstown v. Crowl,* 128 Md. 556, 97 A. 544; *Delmar v. Venables,* 125 Md. 471, 94 A. 89; *Anne Arundel County v. Carr,* 111 Md. 141, 73 A. 668; *Charles County v. Mandanyohl,* 93 Md. 150, 48 A. 1058; *Magaha v. Hagerstown,* 95 Md. 62, 51 A. 832; *Anne Arundel County v. Duckett,* 20 Md. 468; *Calvert County v. Gibson,* 36 Md. 229; *Anne Arundel County v. Duvall,* 54 Md. 350; *Harford County v. Hamilton,* 60 Md. 340. Under the testimony in this case the question, therefore, is whether or not Anne Arundel County is liable to respond in damages for injuries occasioned by an accident on a county road which has been constructed or repaired by placing thereon six inches of loose sand and gravel at a point where the repaired road joins the section of the same road constructed of concrete. There is no proof here that the application of the sand and gravel was done in an improper or negligent manner; so that if there be negligence, it must be in the plan of repair rather than in the execution of the work. In a large portion of the state, covering a great length of time, application of sand and gravel has been the accepted and approved method of constructing and repairing county roads. This applies peculiarly to southern Maryland, wherein local materials for road building and repair are wholly confined to mixtures of sand and gravel, and gravel and clay; whereas over a large portion of the eastern shore, wherein there is also a dearth of local rock for building material, the construction and repair has for many years consisted of the application of oyster shells. We are now asked to hold that the mere use of such materials by a county, in constructing or repairing

its county roads, renders the county answerable in damages for an accident occasioned by the use of such material, even though there be no evidence that the road was improperly constructed, in so far as the application of the material is concerned. This we are unwilling to do, for the reason that we hold that the use of such material in the construction and maintenance of county roads constitutes the exercise of ordinary care to render them reasonably safe for ordinary travel. It is undisputed, and testified to by the witnesses for the plaintiff, one of whom was the driver of the truck, that they observed the change in construction from concrete to gravel from 150 to 200 yards before they actually entered upon the gravel road. Therefore the absence of any warning sign, about which there was a conflict of testimony, is rendered immaterial in this case, because it is undisputed that they had the knowledge which any sign along the road would have imparted. To hold otherwise would, in effect, compel the county commissioners, in order to comply with the rule requiring the exercise of ordinary care in the construction and maintenance of public highways within the county, so as to render them reasonably safe for ordinary travel, to construct and maintain hard surface roads throughout the county. It follows that in our judgment there was error in the refusal of the defendant's 1A prayer, for which the judgment must be reversed.

There are two other objections urged by the appellant to the rulings on the prayers, but in the view which we entertain as to the demurrer to the evidence prayer, it becomes unnecessary to consider those objections.

*Judgment reversed, without a new trial, with costs to the appellant.*