GWYNN OAK PARK, INC. *v.* JAMES L. BECKER
GWYNN OAK PARK, INC. *v.* HELEN E. BECKER
[Nos. 9, 10, January Term, 1940.]

530

*Decided January 24th, 1940.*

The causes were argued before BOND, C. J., SLOAN, MITCHELL, JOHNSON, and DELAPLAINE. JJ.

*Wendell D. Allen* and *O. Bowie Duckett, Jr.,* for the appellant in both cases.

*L. Wethered Barroll* and *Charles D. Harris,* with whom

was *James J. Lindsay* on the brief, for the appellee in both cases.

JOHNSON, J., delivered the opinion of the Court.

Two appeals appear in this record by Gwynn Oak Park, Inc., one from a judgment entered by the Superior Court of Baltimore City in favor of James L. Becker, infant, by Helen E. Becker, his mother and next friend; the other from a judgment entered by the same court in favor of Helen E. Becker, whose suit was to recover for loss of her son's services. Both cases depend upon the same facts and were heard together in the lower court.

Appellees have filed a motion to dismiss the appeals upon the principal ground that appellant's bills of exception were not submitted to their counsel within not less than thirty-five days before the record was required to be filed in this court. Code Pub. Loc. Laws, art. 4, sec. 316; Baltimore City Charter, sec. 411. Orders for the appeals were filed on August 2nd, 1939. The time, therefore, for the transcript of the record to reach this Court was November 2nd, 1939. If the statute is to be literally followed, it was incumbent upon appellant to submit its bills of exception to opposing counsel thirty-five days prior to November 2nd, to wit, not later than September 28th, 1939. Appellant admits that its bills of exception were not submited within said period, and avers that, prior to the thirty-five day period, it had discussed the matter with one of counsel for appellees, and was then "advised and understood," as was the customary practice between counsel, that a literal compliance with the aforementioned statute would not be required. The record further shows that on October 11th, 1939, upon petition of appellant, the time for signing the bills of exception was extended until October 23rd, and the time for submitting them to opposing counsel was extended to October 8th. Bills of exception were received by opposing counsel on October 7th.

In *State, use of Thompson v. Coal Co.*, 150 Md. 429, 133 A. 601, it was held that the failure to submit bills of exception to opposing counsel within the time named in the local statute was not ground for dismissing an appeal, if such bills of exception were submitted within an extension of the time granted by the court, and the opposing party was not prejudiced by the delay. In the present case they were actually signed by the trial court on October 17th, 1939, within the extended time. Moreover, since the transcript of the record was filed in this court on October 18th, it would seem clear that appellees have in no way been injured by any delay in receiving the bills of exception. Compare that decision with *Balto. Paint & Color Works v. Parts Co.*, 173 Md. 210, 195 A. 558, where there was no extension for submitting and signing the bills of exception. Apart from these considerations, Rule 47 of this court provides that "all motions to dismiss appeals shall be filed at least five days before the cases are called for argument, unless the motion be based on some cause arising after that time * * *" etc. Under that rule the motion to dismiss should have been filed not later than January 4th, but two days later no such motion appeared upon the clerk's docket. In view of these considerations, the motions to dismiss the appeals are overruled.

Four exceptions were reserved by appellant to the rulings of the trial court, the first three upon evidence and the last upon the prayers. Before considering these, we will make some reference to the nature of the injuries sustained by the infant plaintiff, James L. Becker, which occasioned the suits.

At the time of the trial, on June 16th, 1939, Becker was thirteen years old. His immediate relatives consisted of his mother and a twin brother, his father, a Lieutenant Commander in the United States Navy, having died in 1934. After her husband's death, Mrs. Becker secured employment in Washington, D. C., leaving her two boys in the home of her aged mother on the Old York Road, and from her earnings she supported the mother and

boys. From some undertermined cause, James, at five years of age, began having epileptic seizures. According to his testimony, and that of several persons who testified for him, he always had a very definite warning of such attacks and realized they were coming on; dark spots would appear before his eyes and shortly thereafter he would loose consciousness, froth at the mouth and twist his body into various shapes, and when the attacks subsided his conversation would be unintelligible and he would remain in a state of stupidity from half an hour to two hours. At times on those occasions he would seem to be asleep, but at no time could he converse intelligently, for he only mumbled and one could make nothing out of what he said. There was also testimony that he had such attacks about twice a month.

Because of the infirmity of his grandmother and her inability to take care of both boys, his mother sought a place for them to stay and was referred to the home of Rev. and Mrs. Current, of Dundalk. She felt that, because the home was in the country and James liked it, it would be a fine place for him. He went there to live in May, 1938, and seemed to adjust very well in his new surroundings.

On the morning of July 20th, 1938, Mrs. Current took him to Gwynn Oak Park, the occasion of her visit being to attend a picnic of the bible class of the church where her husband was the minister. No admission was charged to enter the park, but it was open to the public as a place for picnics and innocent amusements, and refreshments were on sale. Mrs. Current had taken lunch for the visit and, when this was spread upon the ground, she went to one of the park concessions for coffee. When she returned from purchasing the coffee, those present informed her that Becker had stated he was going to the playground. Lunch was then about ready and she began to inquire for the boy, and while searching for him learned from some children that he had been hurt. He had been absent from her just long enough for her to get the cup of coffee. Becker testified that upon reach-

ing the playground he rode the nickel automobiles twice, and then went over to the "sliding board" nearest the water; that he climbed up to its top without any difficulty, but when he put his leg down the "piece you go down on the sliding board straight down," it began to shake back and forth with him; that he recalled falling. He went "through the air twice," spun like a top and knew he hit the ground and then became unconscious. He was then asked to detail something about that "shaking" and answered, it shook from side to side about a foot each way. "About a foot each way? A. Yes. Q. And how did you fall, straight down or over the side? A. Over the side. Q. You don't remember which side it was do you? A. No. Q. What is the next thing after that that you remember? A. When I woke up I yelled for Mrs. Jump to help me a couple times. Q. Did she help you? A. She went over and got Mrs. Current. Q. Then what happened after that? A. She would not let anybody pick me up. She went to call the ambulance. Q. How long was it before the ambulance got there? A. About an hour. Q. Then the ambulance took you to the hospital? A. Yes. The court: What hospital was it? The Witness: The University of Maryland."

Becker positively denied that he felt the slightest discomfort when he reached the top of the sliding board or that he felt dizzy, or had any black spots before his eyes, but stated he was quite well and felt as he always did when he did not have those fits.

Mrs. Eva May Jump, who also attended the picnic, testified that when she arrived at the Park, it was before noon, because one of the events of the day in taking her little boy there was a box luncheon, and she recalled that it was not time to have lunch upon arrival; that she sent the little boy off with his nurse to play for a while, and they went over to one side of the playground while she walked to the far end where the sliding board was and she saw James Becker lying on the ground near the sliding board. At first she did not know whether he was asleep or awake, but about that time he saw her and

called for help, stating that he had fallen from the top of the sliding board and thought he was paralyzed, because he could not move his legs. Mrs. Jump went to the boathouse for help and an attempt was made to lift Becker, but he screamed so and had so much pain they had decided to wait until a doctor arrived. She stated further that he told her he was with the minister's wife, whose name she knew, and in a short while they found Mrs. Current and she, the witness, stayed with him while efforts were made, as she thought, by the authorities to get a doctor; that it had rained in the morning and the ground was wet and muddy, because she sat beside Becker until help came and was herself quite muddy; that the child complained so, and was in such pain, she thought there should certainly be a way to secure a physician and told them that she knew there were seven doctors at Gwynn Oak Junction and one would come out, but they said that they had tried all and none would come; that finally she suggested they call Doctor Smink and told them to mention her name and he would come, and at their invitation she herself called him and he arrived promptly.

Mrs. Current also testified that when she saw "Jimmy" just after he had fallen he was absolutely conscious and recognized her before she got to him, and that when she got up to him she knew that he had not had an epileptic attack; that he told her he had fallen off the sliding board and broken his back, and although the injured boy was compelled to wait two hours before a doctor or an ambulance arrived, he was conscious throughout that period and insisted that his back was broken. During the course of her direct examination, she was asked: "Did some one come from the office and take a statement from Jimmy, somebody from the park?" Her answer was: "I don't remember, because I was going back and forth. They may have and may not have, but they were trying to get some private doctor and they had wasted at least ten or fifteen minutes trying to get in touch with a doctor because they said it would make a difference in the insurance. That is what they told us right there."

Thereupon, counsel for appellant moved to have a juror withdrawn and the cases continued. That motion was overruled, and this action raises the first exception. Appellant earnestly insists the ruling was erroneous, and cites as authority for his contention the cases of *York Ice Machinery Corp. v. Sachs,* 167 Md. 113 at page 127, 173 A. 240, and *International Co. v. Clark,* 147 Md. 34, 127 A. 647. In the latter of these cases, the suggestion of insurance came from a witness offered by the defendant, and this court held that, in view of that circumstance, and the fact that counsel for defendant had not made the motion to withdraw a juror and continue the case until the matter of insurance was referred to during argument of opposing counsel, there was no error on the part of the trial court in refusing the motion then made for a judgment of *non pros;* while in the former case, the suggestion of insurance came from a defense witness, and for that reason the ruling of the trial court in refusing a motion to declare a mistrial was affirmed by this court. A consideration of the supposed harmful statement made by Mrs. Current in her testimony will disclose that her answer making references to insurance was not responsive to the question propounded by counsel. The witness was simply giving herself much latitude in trying to detail what she understood was the reason that no physician arrived to treat Becker earlier; moreover, the reference to insurance was entirely general, especially in that it did not indicate for whose benefit the insurance existed, nor did it indicate with certainty that the statement concerning insurance was made by any one officially connected with appellant. In such a situation, since the question was entirely proper and made without any thought that the answer contained in the record would be given thereto, and the answer itself being so very general and largely meaningless, must it be held that the court's refusal to grant the motion and declare a mistrial was erroneous? We think not, in view of the additional fact that, at the conclusion of the plaintiff's evidence, the trial judge in a most careful and pains-

taking manner charged the jurors, at the request and suggestion of counsel for both parties, that the matter of insurance interested neither the jurors nor the trial court; that the case was to be decided as if there was no insurance; moreover, that it was not known as to what the insurance was and whether it was large or small, and with that question the court and jury was not concerned; that the jurors in considering the case should eliminate entirely the element of insurance and there was no competent proof there was any insurance, nor had they a right so to assume.

If it be assumed that the matter of insurance to the extent brought out by Mrs. Current in her testimony was injurious to appellant, we feel that the remarks of the trial court must have removed and erased any injurious effects which attached because of the utterance, and inasmuch as appellant's counsel joined opposing counsel in requesting it, and were at the time apparently satisfied with what the trial court said, it would seem quite unfair at this time to uphold them in what, should the motions prevail, must be an entirely inconsistent position. See *United Rys. & Elec. Co. v. Carneal*, 110 Md. 211, at page 233, 72 A. 771, for an illustration of this principle. In our judgment, therefore, the trial court, under the exceptional circumstances shown, acted correctly in overruling the motion for a judgment of *non pros*.

Shortly after the arrival of Doctor Smink an ambulance also arrived, and in this young Becker was taken to the University Hospital. Soon after being admitted he was seen by Dr. Irving J. Spear, a specialist in nervous diseases, who a few months previously had observed him in the same hospital, and made certain tests in an attempt to relieve him of his epileptic attacks. Dr. Spear was well acquainted with him and with his history, and gave his opinion that had Becker, at the time of his fall from the sliding board, suffered a convulsion, he would have been more or less stupid for a half an hour to an hour. Upon examining Becker on this occasion, he found he was totally paralyzed from the waist down, that

he had lost all sensation, and had lost control of his bowels and bladder. He had no feeling in the lower extremities and all his reflexes were gone. Dr. Spear advised an immediate operation in the hope of relieving the pressure upon the spinal cord, and accordingly Dr. Charles Bagley, Jr., was called.

An X-ray photograph showed Becker had a fractured spine with dislocation of two lumbar vertebrae compressing the spinal cord. However, it was Dr. Spear's opinion, after seeing him and talking with him on that occasion, that Becker gave no evidence of having had an epileptic attack at the time of his injury.

Dr. Bagley, a specialist in brain surgery, examined Becker in the hospital on the afternoon of the day he was injured, and advised an immediate operation upon the spine to relieve the pressure on the spinal cord, because of paralysis and loss of sensation in the lower extermities. The operation was completed around 7:00 P. M. on the same day, and exposed the cord at the point of the spine which, according to the X-ray, was the seat of dislocation of the tenth over the eleventh thoracic vertebra. Portions of the bone above and below the dislocation were removed so that the cord could be brought into view. While in appearance the spinal cord was not severed, nevertheless between the date of the operation and the time of the trial Becker remained in the hospital, and there had been no change in his condition, for he had no motion in his lower extremities, and no control of his bowels and bladder. According to Dr. Bagley, with the condition having remained so long, it could be said at the time of the trial with certainty that there would be no useful return of muscle power. For as he expressed it: "if one had the fibre cut in his spinal cord, it remains cut. The only paralysis from which one can recover in a spinal cord injury is a paralysis due to a blocking of the function and not a complete cutting of fibre, because those fibres don't go together when they are interrupted."

Dr. Bagley also testified that he knew that prior to the injury Becker had been subject to epileptic fits, and

gave an opinion that, if he had a severe attack lasting from five to ten minutes, he would subsequently be in a stupor several more minutes or even up to an hour. He also stated that, had he been seized with a convulsion when at the top of the sliding board, with the result that he fell and injured himself as he had found him, the fall would not have arrested the convulsion, which would have continued its natural course.

Dr. Henry F. Ullrich, a specialist in orthopedic surgery, who, at the request of Dr. Bagley, had observed Becker from the day following his operation, testified that his clinical signs showed an injury to the spinal cord, and, since the injury had been so long without any improvement, he deemed it one that would not get well.

Jiro Morita, a native of Hawaii, who had resided in the United States since 1913, testified that he was a teacher of physical education; that he knew Becker and his mother prior to the injury. The witness had been stationed at several parks in and around Baltimore, was with the P. A. L. in charge of playgrounds during the summers of 1916, 1917 and 1919 to 1922, inclusive, and on the evening of July 20th, 1938, after hearing of Becker's injuries, made a visit to Gwynn Oak Park and examined the sliding board which, according to the testimony, Becker was using at the time of his fall. He stated that his work brought him in contact with sliding boards of the type examined by him at Gwynn Oak Park. Shown what he was told were photographs of the board from which Becker fell, he was asked to observe any differences between them and the sliding board immediately after the boy's injury. His answer was that the photographs shown him were different from the board when he first saw it just after the accident; that the difference consisted in the slope, for the board which he saw "was a great deal steeper" than the one shown in the photographs, and that would mean that the base was narrower instead of wider. He modified that statement by saying that the slide itself was the part that would be steeper, and added that another difference consisted in hand bars

shown in the photograph at the top of the platform, as, when he saw it, he did not observe any such hand rails at the top. He admitted that he did not test the board by going to its top, but stated that the height from step to step was eight inches, that there were twenty-one steps to the top, making a total of 168 inches, slightly over fourteen feet from the top of the platform to the ground. He examined the board again about July 1st, 1939, and gave an opinion that it had been moved, but was still more than fourteen feet high. He was then asked how that height and angles at which the ladder and slide were adjusted, when seen immediately after the boy was injured, compared with other sliding boards with which he was familiar, and replied that it was "a good deal higher and good deal steeper than other sliding boards." This question next appears: "Did you start to say something else"? And he replied as follows: "I was going to say that that of course would make it less safer." A motion made by appellant to strike from the record the testimony that the board was higher and steeper than other sliding boards was then made and overruled. The objection came too late and the ruling was therefore proper, apart from the fact that the inquiry was relevant and the witness was qualified to express an opinion thereon. *Hochschild, Kohn & Co. v. Cecil,* 131 Md. 70, at page 78, 101 A. 700.

The third exception was reserved to the allowance of a question to the same witness who, when shown three photographs, was asked whether they represented the condition of the board when he examined it one or two days after the accident. This exception not having been dealt with by appellant at oral argument before this court, nor in its brief, we are permitted under section 4 of Rule 39 of this court to treat it as waived, but it may be added that we have found no error in the ruling.

There were then offered defendant's exhibits Nos. 5, 6 and 7, which, it was testified, were photographs of the sliding board in question. According to the testimony they were taken six days following plaintiff's injuries.

The defendant also offered numerous other exhibits of various sliding boards erected at playgrounds throughout Baltimore City in connection with its cross-examination of the witness.

Ann Morita, a daughter of Jiro Morita, fourteen years old at the time of the trial, testified that on July 15th, 1938, she used the slide in Gwynn Oak Park on which Becker was injured, that she was familiar with sliding boards, but considered this particular one steeper than most of those she had been upon, that it did not seem to be very steady, and "sort of moved when you stood on there." When asked how much it moved and just what she meant by that, she stated that it swayed back and forth a little, and later said "I think it was nearly a foot."

Witnesses for appellant testified that the delay in securing a physician and ambulance to care for young Becker earlier after his injuries was due to the fact that the many physicians and ambulances called by them were engaged in emergency work at the Montebello Tunnel explosion that took place on the same morning. They also produced witnesses who testified that Becker had stated to them that, when upon the platform, black spots appeared before his eyes, he got dizzy, and fell. Other witnesses testified that the sliding board had not been moved since its installation, and from the photographs in evidence it appears that the device is in fact a triangular figure, the base of which is the ground, and sides being the ladder and the side. Its height is determined by struts bolted into a wooden beam, resting in solid earth, but the top of the struts support the platform. It was estimated that at least one thousand children had used the sliding board prior to the accident, and ten thousand had used it subsequent thereto without incident, and testified by many that the angle of the board had not been changed in any manner. Other witnesses gave testimony of having examined the board and found the platform immovable, while still others testified that the sliding board was so constructed and arranged that it was almost a practical impossibility to sway it, because of rigidity.

In rebuttal Mrs. Jump denied that before being placed in the ambulance Becker had stated to Mr. Gibson or any one else that black spots appeared before his eyes and he fell off of the board. It was also shown that a similar statement attributed to Becker, and contained in the report of Dr. Locher, was not necessarily made by Becker, because the reports made were made up from such information as was obtainable. At the time of the trial Dr. Locher was engaged beyond the state and not available as a witness, but Mrs. Becker testified that on the day of the accident he did not ask her son how it happened, and on the second day following the accident he could get no information from him beyond the statement that he fell and got hurt. James L. Becker likewise denied having told any one that he became dizzy and fell from the sliding board.

At the close of the entire case, appellant offered in each case its prayers numbered B for directed verdicts because of evidence legally insufficient to entitle the plaintiff to recover. Their refusal is urged as erroneous, and, as we understand it, the principal contention in support of this argument is that the evidence in the case was wholly insufficient to show any primary negligence on the part of the defendant, because the physical facts necessarily show that the evidence upon which plaintiffs rely is unworthy of belief. In support of that proposition we are referred to *Storrs v. Hink,* 167 Md. 194-207, 173 A. 66; *Webb-Pepploe v. Cooper,* 159 Md. 426-430, 151 A. 235; *Miller v. Baltimore,* 161 Md. 312-316, 157 A. 289; *Anne Arundel County v. Vanskiver,* 166 Md. 481, 171 A. 705 and *Fulton Bldg. Co. v. Stichel,* 153 Md. 542, 109 A. 434.

A careful examination of the cited authorities, however, has not convinced us of their applicability to the situation under consideration. For instance, in *Storrs v. Hink, supra,* the plaintiff was standing by the side of an automobile near a street car track, but was struck by the street car as she attempted to open the automobile door. She testified that she looked twice and the track was

visible for four hundred feet, but she neither saw nor heard the car. It was held that her testimony was incredible, for the car had to be there in order to hit her, and she must have seen the car had she looked as she testified. And in *Webb-Penloe v. Cooper, supra,* the same principle was applied, and in the course of that opinion it was said: "When, therefore, the plaintiff testified that he looked and did not see the brightly beaming headlights of the defendant's automobile on a clear moonlight night, when if he had looked he must have seen the rapidly approaching car at excessive speed in time to avoid the accident, the court will reject the testimony as unworthy of consideration." Again in *Miller v. Baltimore, supra,* the plaintiff swore that, although he looked to the sides and ahead and would have seen a rope had it been there, he did not see the rope until the accident had happened and it was then too late to avoid collision. The rope was in fact there, otherwise he would not have come into contact with it. It was held that he was not telling the truth when he testified that he had looked and not seen what he must have seen had he looked. The case of *Fulton Bldg. Co. v. Stichel, supra,* turned on contributory negligence of the plaintiff and has no application to the contention here advanced. Lastly, in *Anne Arundel County v. Vanskiver, supra,* the suit was against the county for injuries resulting from an alleged defective road, and plaintiff's witness testified that the truck in which she was traveling, being old and dilapidated, and driven only at a ten or twelve mile per hour speed, sank from eighteen to twenty inches in sand and gravel with which the road was surfaced, but continued to proceed for a distance greater than twenty feet before overturning. It was held that the story of the witness was so inherently improbable as not to justify an inference that the layer of sand and gravel was eighteen to twenty inches in deph.

Further argument in support of its contention that plaintiff' testimony is incredible and should so be characterized by us rests upon grounds now to be stated. One is that the infant plaintiff stated that he became

dizzy and fell from the sliding board, but it must be remembered that he denied having made this statement, and the same is further denied by his witnesses, in addition to the two specialists whose testimony was to the effect that he had not at the time suffered from an epileptic seizure. Of course, had the jury believed that his fall was caused by reason of an epileptic attack, it would not have found for the plaintiff, for, by prayers submitted by the defendant in each of the cases, the jurors were instructed that if Becker fell from the board as a result of a physical infirmity, their verdict must be for the defendant. Appellant's 6th prayer in No. 9, and 7th in No. 10.

Another reason assigned for disbelieving Becker's story is that the structure of which the sliding board formed a part was physically incapable of swaying. It is true that appellant offered four witnesses who testified to that effect, but it was the province of the jury and not of this tribunal to pass upon their credibility. The principal issue in the case was whether in fact the platform swayed from side to side and caused young Becker to fall therefrom, as testified by him, which testimony was to some extent supported and corroborated by that of Miss Morita. If the jurors believed their stories, they could not have also believed that the structure was rigid and incapable of swaying. We have been referred to no case in which this court has assumed the prerogative of declaring as a matter of law in this character of case that one group of witnesses is to be believed, while another group is unworthy of belief, and we think no authority exists here or elsewhere for that proposition.

Appellant also contends that it has shown beyond any doubt by several witnesses that the position of the sliding board has not been changed since Becker's injury; that its height was the same and, therefore, the opinion of the witness Jiro Morita should be disregarded. In addition to what has already been said in dealing with the exception taken to its admission, much that was said respecting the contention made that the entire structure

was rigid and incapable of swaying could well be applied at least in principle to the point under consideration, but if we concede that his testimony is insufficient as a basis for showing primary negligence on the part of appellant in maintaining what under the circumstances it should have known was an unsafe instrumentality for young children to use, this fact would not prevent the case from being submitted to the jury on the question of primary negligence, for while appellant did not insure the safety of those visiting the park, it did owe them the duty of using due care for their safety and to keep the premises and devices which it knew would be used by visitors in a reasonably safe condition. If the jurors believed Becker's statement that the platform at the top of the sliding board swayed back and forth a distance of one foot while he was attempting to use the board, this, provided they believed Miss Morita correctly detailed a similar experience five days earlier, was evidence to justify them in finding, first, that the device at the time Becker was injured was unsafe for use, and, secondly that such unsafe condition had existed for a sufficient length of time to charge appellant with constructive notice of its defects, and to permit the board to be used by children generally in such condition would have constituted negligence on the part of appellant. Moreover, those facts having been found, a not illegitimate inference would have arisen of a causal connection between the swaying condition in which for at least five days the board had been maintained and Becker's injurious fall therefrom. *Beverley Beach Club v. Marron,* 172 Md. 471, 192 A. 278; *New Theatre Co. v. Hartlove,* 123 Md. 78, 90 A. 990; *Fulton Bldg. Co. v. Stichel, supra; Reed v. Baltimore,* 171 Md. 115, 188 A. 15; *Howard County v. Leaf,* 177 Md. 82, 8 A. 2nd 756; *United Rys. & Elec. Co. v. Dean,* 117 Md. 686, 84 A. 75; *Burke v. Baltimore,* 127 Md. 554, 96 A. 693; *Carlin v. Smith,* 148 Md. 524, 130 A. 340-44; *State, use of Thompson v. Coal Co., supra.*

In the case of James L. Becker, appellant sought a directed verdict on the ground of Becker's negligence di-

rectly causing or contributing to the happening of the injuries complained of, and in the Helen Becker case sought a similar verdict upon the ground that the negligence of Mrs. Current, the agent of Mrs. Becker, in permitting the infant plaintiff to go on the sliding board, directly contributed to the happening of the accident. Treating these in reverse order, it may be observed that the instruction last referred to is in no way supported by the evidence. Indeed, according to the testimony, the fact that the infant plaintiff was going to the sliding board or even to the amusement section was unknown to Mrs. Current until he had been injured. He went there while she had gone for coffee, and upon her return she made immediate inquiry for him, but found him only after he had been injured. Apart from this, it may be stated that there is shown no such outstanding act of negligence on Becker's part and utter disregard for his safety as to justify the court in declaring contributory negligence to exist as a matter of law. That question under the facts presented was for the jury and the prayers were properly refused. *United Rys. & Elec. Co. v. Carneal,* 110 Md. 211, 72 A. 771; *State, use of Kolish v. Washington, B. & A. Elec. R. Co.,* 149 Md. 443, 131 A. 822; *Washington, B. & A. Railway Co. v. State, use of Kolish,* 153 Md. 119, 137 A. 484; *Zulver v. Roberts,* 162 Md. 636, 161 A. 9; *Campbell & Sons v. United Rys. & Elec. Co.,* 160 Md. 647, 154 A. 552; *Sheriff Motor Co. v. State,* 169 Md. 79, 179 A. 508; *Reed v. Baltimore,* 171 Md. 115, 188 A. 15; *Friedman v. Hendler Creamery Co.,* 158 Md. 131, 148 A. 426; *Maryland, D. & V. Railroad Co. v. Hammond,* 110 Md. 124, 72 A. 650.

By appellant's second prayers in both cases the question of contributory negligence was submitted to the jury, and this certainly is all to which it was entitled upon the subject. Defendant's prayer No. 5 in the James L. Becker Case, and No. 6 in the Helen E. Becker case, sought instructions that if the injuries complained of were due to an unavoidable accident unmixed with negligence on the part of the plaintiff or on the part of the

defendant, its agents or employees, then the verdict of the jury should be for the defendant. No reference is made to any part of the record on which reliance is placed to show that an unavoidable accident caused the injuries complained of, unless it be that the jurors could have concluded that Becker suffered an epileptic seizure when he reached the top of the platform and this caused him to fall, but the jurors were properly instructed concerning that situation by prayers already granted. Therefore, the prayers under consideration were entirely unnecessary, and could have only caused speculation and confusion in the minds of the jurors. No error is found in their refusal. *Coplan v. Warner,* 158 Md. 463, 149 A. 1; *American Stores Co. v. Herman,* 166 Md. 312, 171 A. 54; *Harrison v. Smith,* 167 Md. 1, 172 A. 273.

By its D prayer in the James L. Becker case, appellant sought to have the jurors instructed that, since it appeared from the undisputed evidence that the infant plaintiff had for a period of seven years prior to his injuries been subject to convulsions on an average of twice a month, and that this condition was known to him, therefore he was guilty of contributory negligence in climbing up the sliding board mentioned, and their verdict must be for the defendant.

The vice of the prayer lay in the assumption that, because in the past Becker was subject to convulsions at various intervals, he was guilty of contributory negligence in using the sliding board on the occasion considered, without any showing that his injuries were in any manner connected with or occasioned by such convulsions. Its refusal was proper, and the same may be said of a similar prayer refused in the Helen E. Becker case. The issue was not whether young Becker was subject to epileptic seizures, but whether any such seizure contributed to his injuries.

By its eight prayer in the James L. Becker case and ninth in the Helen E. Becker Case, appellant sought an instruction that if James L. Becker had been placed in the care and custody of a nurse or attendant by his

mother, and if the jurors further found that the accident was caused by reason of the fact that the attendant permitted the infant plaintiff to climb upon the ladder or sliding board, then their verdict must be for the defendant. The prayers were not supported by any evidence in the case, and their refusal was proper.

In the first count of the declaration in the James L. Becker Case, it was alleged that appellant maintained a public amusement park for the pleasure and recreation of the general public, and operated in connection therewith various amusement devices which the general public was invited to use; that while infant plaintiff was a patron of the park, rightfully using an amusement device with due care and diligence, he was caused to fall from the top of the sliding board because of negligent and careless maintenance thereof by the defendant, in that it was maintained in an insecure and unsafe manner; that because of its negligence and careless maintenance by defendant, plaintiff suffered serious and permanent injuries which incapacitated him for the remainder of his life.

Allegations in a second count of the declaration were to the same effect, except it was also alleged that immediately following the plaintiff's fall "and for a conserable time afterwards, while the infant plaintiff was suffering from the injuries he had sustained," the defendant carelessly and negligently refused to render assistance to the infant plaintiff, and, as a result of that negligence on its part, plaintiff's injuries were greatly aggravated.

By its E prayer, appellant sought an instruction that no evidence had been offered in the case legally sufficient to entitle plaintiff to recover under the second count of the declaration, and as to such count a directed verdict was sought. The prayer was too general in scope, since unquestionably there was evidence in the case which, if accepted as true by the jurors, would have entitled him to a verdict for damages for all the wrongs alleged by him, except that of damages occasioned by appellant's

negligence in rendering him medical assistance within a reasonable time after discovering the injuries. Conceding that the evidence upon this point was legally insufficient, it would not have been proper to grant the prayer offered to the effect that there was no legally sufficient evidence to entitle him to recover under the entire count. Since it was not restricted to additional or further damages caused by defendant's inattention, its refusal was proper.

The record shows that six prayers were granted on behalf of appellant in each of the cases, while a total of eight were granted in both cases on behalf of appellees. Since a consideration of those instructions has convinced us as to their correctness, this opinion will not be further prolonged by discussing them. Under all the circumstances, the issues seem to have been fairly submitted to the jury and, no error having been found in the rulings complained of, the judgments appealed from will be affirmed.

*Judgments affirmed, with costs to appellees.*