LUCIUS S. STORRS ET AL., RECEIVERS, *v.* N. MARIE HINK

[No. 46, April Term, 1934.]

*Decided June 13th, 1934.*

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Digges, Parke and Sloan, JJ.

*Wallis Giffen* and *Edward J. Colgan, Jr.,* with whom was *Philip S. Ball* on the brief, for the appellants.

*Herbert R. O'Conor* and *Joseph H. A. Rogan,* for the appellee.

Parke, J., delivered the opinion of the Court.

The plaintiff, Nevada Marie Hink, is twenty-nine years of age, married, and a resident of Catonsville, a suburb of Baltimore City. On Saturday, March 25th, 1933, she went to the home of her aunt, Ivy F. Baker, wife of Harry J. Baker, who lives in Catonsville, to go to Baltimore with them in their five-passenger four-door Chevrolet sedan. The three were the only occupants of the automobile. Mr. Baker drove and Mrs. Baker was on the front seat with him, and the plaintiff was alone on the back seat. The automobile was driven east on Edmondson Avenue, and no stop was made, until a store near Kingston Road was reached, and the automobile stopped a few minutes before noon in order to let the plaintiff do some shopping at the store.

Edmondson Avenue at this point may be said, for the purposes of this case, to run east and west, with a width of sixty-three feet and five inches between the curb on the north side and the property line south of the railway right of way. On the north side of the avenue is a footway of seven feet in width. The space south of the line of this sidewalk is used as a public highway and the right of way of the United Railways & Electric Company of Baltimore, a corporation engaged in the operation of an electrically propelled street railway system. The highway is immediately south of the sidewalk. Its width is twenty-five feet, and its metaled surface is macadam, with a con-

crete shoulder along the railroad right of way. The right of way of the railway binds on the southern line of the highway and is thirty-one feet and six inches in width. A double track is built on the right of way of the railway company, which owns in fee simple the portion on which the east-bound track is located, and has an easement on Edmondson Avenue for its westbound track. According to a plat introduced in evidence by the plaintiff for the purpose of showing the locations and distances involved, the northern rail of the west-bound track is four feet and nine inches south of the southern line of the macadam highway or the roadway of Edmondson Avenue. The north shoulder of the west-bound track is on this space of four feet and nine inches, and slopes from the tee rail tracks of the railway to the concrete shoulder of the highway, and is roughly surfaced with dirt and stone ballast. Immediately south of this are the tee rail, stone ballasted, double tracks, measuring five feet four and one-half inches in extreme width, and separated by a center ballasted strip of five feet in width. The tracks are similar to those of a steam railroad in the country. A border strip of eleven feet in width south of the east-bound railway track takes care of the projecting ends of the ties and the ballasted slope from the bed of the track. A highway called Kingston Road enters Edmondson Avenue from the south after crossing at grade the railway's right of way with its surface level with the top of the rails. Rock Glen Road is the next highway to the east, and it forms a junction with Edmondson Avenue, south of the railway track, where Edmondson Avenue has similarly crossed the right of way, and, turning to the northeast, proceeds south of the railroad, while the north fork of Edmondson Avenue bears to the northwest and north of the railroad, and is called Greenwich Avenue. On the north side of the west-bound track and directly east of the Edmondson Avenue crossing there is a west-bound car stop. The next west-bound car stop is two blocks to the west at North Bend Road which is west of Orpington Road, a street which enters Edmondson Avenue from the north, and there ends

with its center line about one hundred and seventy feet from the west side of Kingston Road, when prolonged, as is shown by the plat.

The point where the automobile in which the plaintiff was a guest had stopped, on the south side of Edmondson Avenue, was placed by her at about five feet west of the west line of Kingston Road. The front of the automobile was facing east, with the two right wheels on or near the line between the concrete shoulder and the railway right of way; and from that point the railway tracks extended in an approximately straight line to the east for a distance of about two hundred and fifty feet, as shown by the plat, and then curved to the right or northeast, affording a view of an approaching street car for a distance of about four hundred feet.

After the automobile stopped, the Bakers remained inside, but the plaintiff started to open the right rear door and found it hard to open, and had to use her knee to force the door by pushing, which took her a couple of seconds. She closed the door tight, crossed to the north side of the street, made a purchase of cigarettes and a bag of candy and walked hurriedly back, with the two small packages containing her purchases in her arms. She looked east along the track and saw no street car, and then walked back of the automobile, whose motor had been kept running, and thence to the right rear door, and before she turned to open this door she looked and again looked as she put out her left hand to take hold of the handle to open the door, and there was no car in sight. She then turned and placed her right foot partly under the fender, partly on the shoulder and cinders of the road, and her left foot out a couple of inches from her right foot to brace or balance herself to open the door, which was built to swing back. She tried with her left hand and could not get the door open. She was then facing the automobile with her back to the track a couple of seconds, when her aunt, hearing her at the door, turned completely around in her seat to help. The plaintiff said she had not moved an inch from the time she took her position at the door, "when," in

her words, "all of a sudden I was caught in a trap, I was hit on the left side by the street car, my whole left side was hurt." She swore she was thrown against the automobile and to the ground, and the rear wheels of the street car caught her left leg and cut off her foot. She had a big bruise over her heart and many and severe bruises on the left side of her body, over the left side of her back, over her left side and left buttocks; her throat on the left was cut so as to require four stitches.

From the time she reached the automobile after her shopping until she was struck, no warning or signal was given by those in charge of the street car. Nor did she either hear or see the approaching street car. Her estimate of time was that from when she reached the rear of the automobile until the happening of the accident about fifteen or twenty seconds had passed, and that of this period she was at the door from about five to ten seconds.

The testimony of the uncle is chiefly in corroboration of the plaintiff's story. He, however, saw the approaching railway car when the plaintiff was standing at the door of the automobile. The car was then estimated by him to be about two hundred or two hundred and twenty-five feet away, and plainly visible to any one in the position of the plaintiff. The uncle turned his head and put his foot on the accelerator to get ready to make a quick start, and, then, looked again down the tracks to the east and observed that the west-bound street car was sixty or ninety feet away. Although the uncle testified that he believed the plaintiff to be in grave peril, and saw her tugging at the door, he made no effort to warn her, nor any effort to move his automobile away, but remained **mute and inactive until the front of the street car passed** her and she was struck by the body of the street car. When cross-examined, he said he would figure that "the front doors of the street car had passed the plaintiff before she was hit," and he corroborated her in the statement that plaintiff never changed her position after she assumed it at the automobile door.

The other witness for the plaintiff who saw the accident was her aunt. While waiting for the return of her niece, the aunt was engaged in looking at some pictures, and she did not observe any of the details of the accident until her attention was aroused by hearing some one at the handle of the door trying to open it. Mrs. Baker then looked back and saw the plaintiff, and turned around to help her open the door by hitting the door with the palm of her hand. While so engaged, the aunt suddenly saw the street car crossing Kingston Road, and the plaintiff, who had been standing perfectly still, struck on the left side by the shoulder of the street car. The aunt further testified that the window of the automobile where her husband sat was all the way down and her own window was "mostly all the way down," and that no bell or signal was sounded by the approaching street car.

In addition to this testimony, the uncle testified that when he first saw the street car it was running at a "rather high rate of speed and just swinging backwards and forwards," and that the car did not slow up until it had passed his automobile. At other points in his testimony, his descriptive terms were "swaying motion of car," "rocking back and forth;" and, with respect to its progress, "pretty good speed." There is no evidence that this familiar movement of a street railway car in motion was unusual, excessive, or attributable to any defective condition of the equipment, track, or roadbed. Nor did the uncle attempt to express an opinion as to the rate at which the street car was traveling. One witness for the defense estimated the rate at ten or fifteen miles an hour, and, on cross-examination, stated that he thought the rate was between fifteen and twenty miles an hour. Another estimate by a witness for the defense was twenty miles, and the conductor expressed his opinion that the rate was from eight to ten miles an hour. The motorman was the operator of the car and was in the best situation to know, and he testified that he had cut off the electric current about half way between Kingston Road and Rock Glen Road. His opinion was that he was going at fifteen

miles an hour when he first saw the plaintiff and decreased the speed to ten miles when the accident happened. His further testimony, which was not contradicted, was that the street car was running on practically a level stretch, and that the cars are geared to do twenty-two miles on a level. The opinion of the witnesses in reference to the distance the street car traveled from the point where the plaintiff was struck varies from fifty to three hundred feet; but those who testified to the greater distances qualify their estimates by fixing the point of stop to be at Orpington Road, which, according to the plat, could not be more than one hundred and seventy feet. The significance of this distance, with reference to the speed of the street car, is lessened by the proof that the motorman did not use the emergency brake, and did not apply a brake until after the car had passed the plaintiff and he had heard the noise of the blow on the side of the car. The motorman was the only witness who gave any evidence as to the space in which his car could be stopped. His testimony was that at the rate of ten miles an hour the car could have been stopped, in his judgment, in about sixty or seventy feet; at the rate of fifteen miles, in about eighty or ninety feet; and, by the application of the emergency brake, in probably ten feet less than these distances.

The differences in the estimates of distance between the same points are another illustration of the frequent inaccuracy of this kind of testimony, and must yield to the unchallenged and undisputed measured distances of a survey by a competent person, and then by him accurately delineated on a plat, as the plaintiff had done in the action at bar. So the testimony of distances, which is based on memory, estimates, or casual observation, must yield to that which is based on actual measurement or reference to the definite data of an accurate plat. *La Pointe v. Boston, etc. R. Co.*, 182 Mass. 227, 65 N. E. 44; *Sweat v. Boston, etc. R. Co.*, 156 Mass. 284, 287, 31 N. E. 296; *Schell v. United Rys. & Electric Co.*, 150 Md. 663, 666-668, 133 A. 598. Accordingly, the court in this opinion will

202

use the distances shown by the plat of the scene which was offered in evidence by the plaintiff, rather than the testimony of witnesses, whose estimates did not profess to be accurate.

Other testimony on the part of the defendant tended to show that the motorman had stopped and let out a passenger at the Rock Glen Road car stop, and then started the car and traveled at the rate of fifteen miles an hour on a practically level grade until, nearing the Kingston Road, he reduced the speed to ten miles an hour for that crossing, for which he sounded his gong. He first saw the plaintiff about thirty-five feet east of the crossing, moving rapidly across Edmondson Avenue through the traffic, and he gave three or four taps on the gong, and ceased when he saw her stop on the concrete shoulder adjacent to the right of way.

When the plaintiff reached the rear of the Baker automobile, the motorman observed her turn east on the shoulder of Edmondson Avenue, and make a few steps on the shoulder, facing and looking at him, and walk to the door of the automobile, and then turn to the door, where she was in a position of safety on the shoulder of the road beside the automobile. The car was then about ten feet from the plaintiff, and she remained in this attitude, until the front of the car passed her, without making any movement to open the door or for any other purpose. The motorman observed nothing further until he heard a noise as though something were slapping against the side of the car and he applied the brakes and stopped about sixty feet west of where the plaintiff was found lying. The motorman and conductor did not see the accident, but there was testimony on the part of those who did. Their testimony tended to prove that the accident happened in the manner described by Willi May Watkins, whose husband had parked his automobile ten to fifteen feet back of the Baker automobile but in line with it, and had then gone to a shop on the north side of Edmondson Avenue. Mrs. Watkins remained in the automobile, and, after she had seen the plaintiff crossing the avenue, Mrs. Watkins

looked for her husband, and then, turning her attention to the plaintiff, she thus testified "She was standing by the door of her car. She had her hand on the door as if she was trying to open it, and she just moved her body just this way (indicating) as you usually do when you open the door, and the car hit her hip and turned her around. I don't know whether or not she stepped back, but I know she moved her body. Whether she moved her foot or not I can't say. The street car, I think, struck her hip and turned her around, if I am not greatly mistaken. Her body I think was thrown. I think the car threw her. She turned completely over and her foot went under the rear truck of the car. I know the vestibule of the car had passed her. That is why I was holding my breath hoping she would stand still until the rest of the car went by. She did not fall right where she was struck. Where her body finally came to rest I can't just say where —back of their car. Just her feet were over the rails; her body was not."

To quote further from the testimony of Mrs. Watkins: "Q. What was it that attracted your attention to her when she was standing at the door of her car? A. Because I knew she was awfully close to the trolley."

And on cross-examination, she said: "She had her hand—I think it was her right hand—on the knob and she just did this way (indicating) as you do when you open a machine door. She did not actually open the door, I can't tell you that. I couldn't see the door because I was just on a line with the machine, did not actually see the door open. I didn't pay any attention afterwards. After the accident happened I didn't notice the automobile door open, but I saw her with her hand outstretched towards the door knob and then I didn't observe any step on her part. Whether she took a step I don't know, didn't observe any. And I noticed just a slight movement of her hip. And that was according to my recollection a movement to the right. That is to say with her right hip extended to open the door. I wouldn't say the middle of the car struck her, but I know the front of the car had

passed her. If it was not the middle it was near the middle. She was thrown some distance towards the rear of their car and then rolled over and her limb went under the rear truck."

On this testimony, and some further explanatory facts now to be stated, the fundamental questions raised on this appeal are whether (1) there was any evidence legally sufficient to entitle the plaintiff to recover; or (2) the uncontradicted evidence established that the plaintiff was guilty of such contributory negligence as to bar her action.

1. The testimony on the part of the plaintiff tended to show that she was standing facing the side of an automobile and away from the railway track, with one foot on the outer verge of the concrete shoulder of the highway and with the other foot on the narrow strip bordering on the north rail of the west-bound track, so that by a momentary and slight shift of her position towards the railway track she would be in imminent danger of being struck by the side of an approaching street car. Under such circumstances, it became the duty of the motorman to warn the party of the approach of the street car in time for her to avoid the danger of movement towards the railway track. Although the testimony is contradictory on this point, there is legally sufficient evidence on the part of the plaintiff from which the jury might find that no signal was given by the motorman, who had no right to assume that the plaintiff would remain motionless where she stood unless she had notice of the approach of the street car. If the jury found from this evidence a failure to give adequate warning, primary negligence would be established.

2. The second question, of contributory negligence, is what the defendant chiefly relies upon and the principal subject of argument between the parties on brief and at bar. An action will not be withdrawn from the jury on the ground of contributory negligence unless there is some prominent, decisive, and controlling act of negligence in regard to which there is no room for ordinary

minds to differ. *Cooke v. Baltimore Traction Co.*, 80 Md. 554, 31 A. 327.

The plat makes clear that the measured distance from the north rail of the west-bound track and the outer edge of the concrete shoulder of Edmondson Avenue is four feet and nine inches. The undisputed testimony introduced by the plaintiff is that the forward part of the car, where the operating platform and the vestibule are placed, is six and one-half inches narrower on either side of the center line of the car than the main body or passenger section. As the extreme projection of the main body of the street car is nineteen and one-half inches, when measured from the inner edge of the tee rail, which is around two and one-quarter inches in width, the projection of the forward end of the street car beyond the outer edge of the rail is ten and three-quarter inches, and the similar projection of the main body of the car is seventeen and one-quarter inches. Consequently, the projection of the front and of the body of the street car lessened the clear space between the north rail of the west-bound track and the edge of the concrete shoulder of Edmondson Avenue to three feet and ten and one-quarter inches for the front of the car and to three feet and three and three-quarters inches for the body. There is no evidence that the motion of the street car lessened this space.

So it follows that there was a minimum space of thirty-nine inches between the side of the body of the street car and the line of the cement shoulder. The uncle places his automobile with its right wheels about the line of division between the concrete shoulder and the shoulder of the railway track; and the plaintiff even more accurately fixes the position, when she said she faced the side of the automobile, put her right foot partly under the fender, and resting partly on the shoulder and cinders of the road, with her left foot out a couple of inches from her right foot to balance and brace herself. As she could not stick her right foot under the fender farther than her shin, the plaintiff was standing at a point approximately thirty inches away from the side of

the body of the street car. In the testimony she is described as a "little woman," twenty-nine years old, and underweight. Consequently, while standing erect in this position, she was at least twelve to eighteen inches clear of the outside line of the body of the street car and beyond any possible contact with any part of the street car, so long as she retained her position and remained erect. The street car had been traveling in a straight line for over two hundred and fifty feet before the accident, and the natural tendency of a moving body is in a straight course, and an oscillation of a street car, whose weight is 45,700 pounds, with the tread of its front and rear wheels eleven feet and five inches apart, that would have caused the street car to reach out from twelve to eighteen inches to strike the plaintiff as she remained in her position without moving, would have thrown the car off the track. The plaintiff, therefore, was in a position of safety, with a part of her foot on the margin of the concrete shoulder of the highway, and was in no danger so long as she did not change her place and remained erect, no matter what was the speed of the trolley car. She could only be in danger from her own imprudent act.

The plaintiff, however, knew that street cars ran on the tracks at a pretty high rate of speed and realized the peril which any imprudent movement of hers would create if a street car should be simultaneously passing. She testified explicitly to that effect, and declared that there would not "have been room to open that door," but "if the door was not open there was room for the street car to pass." Notwithstanding her knowledge and the warning it gave, the plaintiff ventured the attempt to open an automobile door which she knew from experience would be difficult. She testified that from the time she got to the door until she was struck was about five to ten seconds. She looked twice for a trolley car, and testified she saw none and heard none, although she could see the track for four hundred feet. The first time she looked was at the rear of the automobile, about three or four steps from the back door. The second time she looked

was at the door, which she attempted to open. Attributing to the approaching street car the maximum speed that was testified to, of twenty miles an hour, the car was one hundred and forty-seven feet away five seconds before the accident and two hundred and ninety-four feet away ten seconds before. So, the car was visible to her when she looked, just as it was visible to her uncle when he looked twice, and the first time saw it two hundred or two hundred and twenty-five feet away and the second time sixty or ninety feet away. Her testimony, therefore, that she did not see the approaching street car is incredible. Her further testimony, as well as the testimony of her uncle and aunt, that, although there for the purpose of opening the door, she remained, without change of her position or movement of her body, close to the side of the automobile, a foot or eighteen inches away from any possible contact or danger of being struck, and was struck by the street car, is likewise incredible. Her narrative of the accident, under the indisputable situation, is physically impossible. *Balto. Trac. Co. v. Helms,* 84 Md. 515, 526, 36 A. 119; *Phillips v. Wash., etc. Ry. Co.,* 104 Md. 455, 458, 65 A. 422; *Gerlach v. Cumberland, etc. R. Co.,* 142 Md. 638, 642, 121 A. 577; *United Rys. & Electric Co. v. Sherwood,* 161 Md. 310, 157 A. 280; *Sparr v. United Rys. & Elec. Co.* 114 Md. 316, 79 A. 585; *United Rwys. & Elec. Co. v. Durham,* 117 Md. 192, 83 A. 154; *Wash., B. & A. R. Co. vs. Goodwin,* 140 Md. 115, 116 A. 911; *State, use of Morrow, v. Wash., B. & A. R. Co.,* 145 Md. 285, 125 A. 538. The truth is that she either miscalculated the distance and moved into the way of the car, or, tugging to open the door, extended or bent her body so that it was thrust over the intervening space of safety against the side of the moving street car.

The motorman saw the woman cross the street, walk along the side of the automobile and stop at the door as he was approaching. She, and not the motorman, knew the difficulty to open the door. The plaintiff was in the full possession of her faculties and the use of her members. She was free to move in whatever direction the

circumstances indicated; but the street car's movement was confined to the track. Up to the last second, a few steps taken would have carried her to the front or back of the automobile. Even where she stood was safe, as her position at the side of the automobile, if maintained for a few seconds, assured the plaintiff of no hurt befalling her. She could only encounter danger from the movement of the street car by her own lack of due care under the circumstances. In short, she was in no peril, except by her own volition and initiation. The motorman had the right to assume that the plaintiff would act with reasonable care for her own safety in avoiding danger, and that when he saw her look she had seen the clearly visible and moving street car. Up to this point there was nothing in the conduct of the plaintiff or of the circumstances to indicate to the motorman that the plaintiff was unaware of the oncoming car or that she was in any peril whatsoever from its passage. The sudden and unexpected act of the plaintiff which thrust her body from security into danger was a matter of a few moments, which no reasonable man in the exercise of ordinary prudence would, under the circumstances, have anticipated, and which, having occurred, afforded no sufficient opportunity to the servants of the defendants to avert in the exercise of due care. There is no rule that requires a motorman to anticipate that a person standing in a position of safety will voluntarily thrust his body in the way of the side of an approaching street car under the control of the motorman. *State v. Wash., etc. R. Co.,* 149 Md. 443, 458, 459, 131 A. 822; *Gitomir v. United Rys. Co.,* 157 Md. 464, 468, 469, 146 A. 279. To quote from *Pollock on Torts* (8th Ed.) p. 478: "Neither shall you complain that he did not foresee and provide against your negligence. We are entitled to count on the ordinary prudence of our fellow-men until we have specific warning to the contrary. * * * And generally no man is bound (either for the establishment of his own claims or to avoid claims of third parties against him) to use special precaution against merely possible want of care or

skill on the part of other persons who are not his servants or under his authority or control."

There is no basis in this case for the application of the rule of the last clear chance, as there is no legally sufficient evidence tending to prove that the peril of the position in which the plaintiff had put herself was known to the servants of the defendant or should have been anticipated by them in time to avoid the accident by the exercise of ordinary care and caution. *Taylor v. Western Md. Ry. Co.*, 157 Md. 630, 634, 147 A. 531; *Carey v. C. & W. E. Ry. Co.* 106 Md. 529, 533-535, 68 A. 197; *Egner v. United Rys. Co.*, 98 Md. 397, 56 A. 789; *United Rys. Co. v. Fletcher*, 95 Md. 533, 52 A. 608.

The plaintiff has greatly relied upon the decision of *State, use of Trenary, v. United Rys. Co.*, reported in 143 Md. 112, 122 A. 20, where the court declared the doctrine of the last clear chance was applicable, and held, under the facts of that case, that, because of the dispute with reference to the facts and the inferences to be drawn from them, the questions involved should have been submitted to the jury. It should be observed that the cited case did not lay down any new principles, but decided that the particular group of interrelated facts on the record of that appeal fell within an existing rule. There are few cases in a given class of accidental railway accidents which do not exhibit some resemblance in circumstances, but this similarity, although transitorily deceptive in a search for a governing precedent, may finally be found to be negligible for the reason that, on a close reading, a fundamental distinction between the prior case and the instant case develops because, among the facts common to both cases, is found a decisive fact or set of facts that is not common to both cases.

So, while there are many similar or analagous facts in the case so much relied on by the plaintiff and the case at bar, yet the controlling facts are unlike and fundamental. In the prior case, Trenary was in a group of five people who were crowded in a space five to seven feet wide between the automobile omnibus and the railway

track, and who were occupied and their attention engrossed in the act of three of the group getting on the omnibus. While this shifting group and their danger were apparent to the motorman in time for him to have avoided the accident, there was evidence that the person fatally injured was not in a position to observe the approach of the railway car, and did not see it because he was in a group and another person was between him and the car. Nor was he warned of its approach, and a railway car on the more distant parallel track had just passed. In contrast with these facts, the plaintiff at bar looked and must have seen the approaching car, and therefore was advised of the danger in time either to withdraw to another and more secure position or to protect herself from any injury by remaining in her position at the door of the automobile. So, in the case at bar, unlike the cited case, there was a voluntary change by the plaintiff from a position or posture of safety to one of danger, which was the final and decisive and intervening act of negligence, which was the proximate cause of the injury sustained by the plaintiff, and the doctrine of the last clear chance is not applicable.

For the reasons assigned, it was error on the part of the *nisi prius* court to refuse to grant the defendants' B prayer withdrawing the case from the jury.

*Judgment reversed, without awarding a new trial, with costs to the appellants.*

URNER, J., dissents.